THE PROPELLER GENESEE CHIEF, HER TACKLE, APPAREL, AND FURNITURE, WILLIAM L. PIERCE, MASTER, ALEXANDER KELSEY, WILLIAM H. CHENEY, WILLIAM HUNTER, LANSING B. SWAN, GEORGE R. CLARK, AND ELISHA B. STRONG, APPELLANTS, *v.* HENRY FITZHUGH, DEWITT C. LITTLEJOHN, AND JAMES PECK.

The act of Congress, passed on the 26th of February, 1845, (5 Stat. at Large, 726,) extending the jurisdiction of the district courts to certain cases upon the lakes, and navigable waters connecting the same, is consistent with the Constitution of the United States.

It does not rest upon the power granted to Congress to regulate commerce.

But it rests upon the ground that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdiction, as known and understood in the United States, when the Constitution was adopted.

The admiralty and maritime jurisdiction granted to the Federal Government by the Constitution of the United States is not limited to tide-waters, but extends to all public navigable lakes and rivers, where commerce is carried on between different States, or with a foreign nation.

In the present case of collision between a vessel navigated by steam and a sailing vessel, the evidence shows that the former was in fault.

It is the duty of every steamboat to keep a trustworthy person employed as a look-out; and if there be none such, additional to the helmsman, or if he was not stationed in a proper place, or not vigilantly employed in his duty, it must be regarded as *primâ facie* evidence that the collision was the fault of the steamboat.

THIS was an appeal from the Circuit Court of the United States for the Northern District of New York.

It was a libel filed by Fitzhugh, Littlejohn, and Peck.

The libellants filed their libel in the District Court for the Northern District of New York, against the propeller Genesee Chief, and Pierce, as master, in which they allege that they were the owners of the schooner Cuba, a vessel of fifty tons burden and upwards, enrolled and licensed for the coasting trade, and employed in the business of commerce and navigation between ports and places in different States and territories upon the lakes, and navigable waters connecting said lakes. That said schooner, at the time of the loss and collision, thereinafter mentioned, was laden with five thousand nine hundred and fifty-five bushels of wheat; and on Lake Ontario, about forty miles below Niagara, bound from Sandusky, in the State of Ohio, to Oswego, in the State of New York. That the propeller Genesee Chief, of which the appellant, Pierce, was master, and being a vessel of fifty tons burden and upwards, duly enrolled and

licensed as aforesaid, and then actually engaged in commerce and navigation as aforesaid, while at the place aforesaid, on the sixth day of May, 1847, by the carelessness and negligence of the master and crew, ran foul of and sunk the said schooner, with her cargo; and concluding with the usual prayer for the condemnation of the vessel and for the payment of the damage.

The claimants of Alexander Kelsey and others, and the master, put in their joint and several answer to the libel, admitting the collision and the loss of the Cuba, but denying that the collision happened from any want of care, negligence, or mismanagement of the master or crew of the propeller, and alleging that the collision occurred in consequence of, and was occasioned by the carelessness, ignorance, mismanagement and want of skill of the master and crew of the Cuba. The answer also contains the following objection to the jurisdiction of the court: "And these respondents aver that the respondents Alexander Kelsey, William H. Cheney, Lansing B. Swan, George R. Clarke, Elisha B. Strong, and William L. Pierce, are all citizens of the State of New York, and that the said Henry Fitzhugh and Dewitt C. Littlejohn are also citizens of the State of New York; and they also aver that the collision set forth in the said libel occurred within the territorial boundaries of the said State, and not on the high seas, nor in any arm of the sea, river, creek, stream, or other body of water where the tide ebbs and flows, and therefore they say that this court has no jurisdiction over the matters set forth in the said libel, and they pray that the same effect may be given to their defence in this respect as if the same were made by special plea or exception."

The cause was tried before his honor the district judge, in April, 1848, and a decree passed in favor of the libellants. The respondents appealed to the Circuit Court, and the cause was tried in that court in June, 1849. The decree of the District Court was affirmed.

The master of the propeller, Pierce, was allowed to file a separate answer in the Circuit Court, and he was sworn as a witness for the claimants.

From this decree the owners of the propeller appealed to this court.

It was argued by *Mr. Mathews*, for the appellants, and by *M. Grant* and *Mr. Seward*, for the appellees.

The points made by the appellees (the libellants) will first be stated as they were made in the Circuit Court and repeated here. The natural order appears to be that the libellants should prove their case.

*Mr. Grant*, for the libellants, contended that the following facts were proved by the evidence, and made these points:

1st Point. The propeller was bound up the lake with a light load, going eight miles an hour, while the Cuba was bound down the lake, heavily loaded, with a light breeze, making only two miles an hour. The courses of the two vessels were about one hundred rods apart, and they would have passed each other at that distance, had not the propeller swung off from her course.

2d. The Cuba was close-hauled on the wind, and having laid her course, was justified in keeping it.

1. A vessel having the wind free must give way to one close hauled, or be responsible for the consequences. 2 Dodson, 36, 37; 2 Chitty's Gen. Prac. 514; Story on Bailm. 611; Am. Law Journal, vol. 4, No. 4; Lyle v. The Conestoga; Id. Feb. 1849, 354.

2. A steam vessel is regarded as always having the wind fair. 2 Hag. Ad. Rep. 173; 3. Id. 414; 2 Wend. 452; 2 Chitty's Gen. Prac. 514, 515; Story on Bailm. 611; Conk. Ad. Prac. 305, 308; Abbott on Ship. part 3, p. 300, 308, 311; 10 Howard, 558–587.

3. The proceedings on the part of her master were strictly regular; he performed his duty in every respect. Story on Bailm. 611; The Thomas, 5 Rob. No. 345; 5 Rob. 316.

4. The Cuba had a good light, which was hung in a conspicuous place, and was seen by the propeller four or five miles off.

5. No response was given to the Cuba's hail, and the propeller continuing on her swinging course to bear down directly upon the Cuba, the captain was justified in his order to put the helm down; especially as the danger had then become so imminent, that the putting the helm up or down could not have avoided the collision or changed its result.

6. Pierce is not a competent witness for the appellants. 1 Browne's Civ. Co. Law 500, 501; 1 Story, 96; Ware's Rep. 367; Wood's Inst. 315, 316; 2 Page's Ch. Rep. 54; 1 Sumn. 343, 344, 401, 432; 2 Gall. 48, 50; How. Rep. 53, 57; 2 Hag. Ad. Rep. 149, 151; 1 Pet. Ad. 139, 141, 211.

1st. The appellants have been guilty of delay. They might have got this testimony in the court below. Conk. Ad. Prac. 755; 1 Sum. 331.

2d. The moving papers are defective in not showing how the testimony of Captain Pierce is pertinent. 1 Sum. 344, 345.

7. The collision was occasioned by the carelessness, negligence, and mismanagement of those having charge of the propeller, and the appellants are responsible for all the consequences.

1st. The propeller swung from her course, as if to pass the Cuba on her larboard side, and, while thus swinging out, she ran down and sunk the latter, with her engine in full operation.

2d. There was no officer of the watch on duty.

3d. There was no look-out.

4th. The wheelsman is not a look-out. 10 How. 558, 587.

5th. W ite, the wheelsman, was asleep; if not, he was incapacitated by liquor or imperfect vision.

6th. Boskkirk was not competent as a look-out, even if he had been on duty.

7th. There was no response from the propeller to the hail of the Cuba. Abbott on Ship. 234; Story on Bail. 6, 611; 3 Kent, 230; 5 Id.; Brig Cynosure; 7 Law Rep. 222; The Shannon, 1 Wm. Rob. 467; 1 Law Rep. 313, 318; Conk. Ad. 305 – 311.

8th. The engine was not stopped. It was a clear starlight night.

8. The propeller must account for her situation, and show satisfactorily that there was no mismanagement, or mistake, or blame, that can be reasonably imputed to her. The Perth, 3 Hag. Ad. R. 414, 417.

9. Her excuses are unsatisfactory and untrue, to wit:

1st. That the Cuba had the wind fair; that she changed her course and crossed the propeller's bows.

2d. That the Cuba had no light; and if she had, the night was so thick, smoky, and foggy, it could not have been seen by the propeller.

10. The case, as claimed by the appellants, is not possible; while the one proven by the libellants could have occurred.

Under the former, the vessels could not be brought together by their courses and speed, as is demonstrated by the diagrams.

11. The act of Congress of 1845, extending the jurisdiction of the District Court to the cases therein mentioned, is constitutional. 5 How. Rep. 441; 6 Id. 344, 386; Gibbons v. Ogden, 9 Wheat. 1.

12. The libellants are entitled to recover the amount of damages allowed them in the decree below, together with the interest thereon, "with costs, in the District Court, in the Circuit Court, and in the Supreme Court, and damages and reasonable counsel fee. Rule 17, 20."

*Mr. Mathews* made the following points:

1st. The District Court had not jurisdiction of the case, and the libel should have been dismissed for that cause. The following three reasons are given for this:

1. It is not a case of admiralty and maritime jurisdiction,

under the Constitution of the United States, which is limited to cases occurring upon waters within the ebb and flow of the tide. The Jefferson, 10 Wheat. 428 ; The Steamboat Orleans v. Phœbus, 11 Pet. 175 ; The United States v. Combs, 12 Pet. 72 ; Waring et al. v. Clarke, 5 How. 441 ; New Jersey S. N. Co. v. Merchants Bank, 6 Id. 344 ; Thomas v. Lane, 2 Sumn. 1, 9.

2. It is not a case arising under the Constitution, or any law of Congress. 1 Pet. 512, 545 ; 10 How. 99.

3. The act of Congress of the 26th February, 1845, is not authorized by the Constitution of the United States, and is in conflict with it, and is void.

The Constitution declares that the judicial power of the federal courts shall extend to all cases arising under the Constitution and the laws of the United States, and to all cases of admiralty and maritime jurisdiction, and to other cases particularly enumerated, but which it is unnecessary to specify here.

It is supposed that the jurisdiction of the federal courts is limited to the cases and subjects particularly enumerated in the Constitution, and that it cannot be extended beyond these. Such has been the uniform construction of that instrument.

In the case of Marbury v. Madison, 1 Cranch, 137, it was held that the Supreme Court had not jurisdiction to issue writs of *mandamus*, and that the 13th section of the Judiciary Act of 1790, conferring such jurisdiction, was not authorized by the Constitution, and was void.

In Hodgson v. Bowerbank, 5 Cranch, 303, jurisdiction was claimed, on the ground that an alien was a party under the 11th section of the Judiciary Act of 1789. " Marshall, C. J. Turn to the article of the Constitution of the United States, for the statute cannot extend the jurisdiction beyond the limits of the Constitution." The same point was ruled in the case of Mossman v. Higginson, 4 Dall. 12.

In the 83d number of the Federalist, Mr. Hamilton uses the following language : " In like manner, the authority of the federal judicatures is declared by the Constitution to comprehend certain cases particularly specified. The expression of those cases marks the precise limits beyond which the federal courts cannot extend their jurisdiction; because the objects of their cognizance being enumerated, the specification would be nugatory if it did not exclude all ideas of more extensive authority." And, again, in No. 82, he says : " I shall lay it down as a rule, that the State courts will retain the jurisdiction they now have, unless it appears to be taken away in one of the enumerated modes." And see, also, opinion of C. J. Marshall, in Marbury v. Madison, 1 Cranch, 173 – 174.

The doctrine which I deduce from these authorities is this: the Constitution declares that the judicial power shall extend to certain cases, which are particularly expressed, and limits its exercises to those cases.

If this proposition is sound, then the act of the 26th February is not authorized by, and is in conflict with, the Constitution; but the act extends the jurisdiction to cases which this court has already held are not among the cases particularly specified in the Constitution.

It may, however, be said that, under the power given to Congress to regulate commerce among the several States, and to make all laws which shall be necessary and proper for carrying into execution this power, Congress was authorized to make the law in question. It may be observed, in the first place, that the act does not purport to be a regulation of commerce. The title of the act shows that its object is simply to extend the jurisdiction of the district courts to cases which were not before within the cognizance of those courts. Although the title of an act cannot be regarded as any part of the act itself, it is sometimes resorted to, to ascertain the object and purpose of its enactment. See Dwarris on Statutes, 653.

But I have already shown, that the Constitution contains a prohibition against extending the judicial power beyond the cases specified in the Constitution. The Constitution must be so construed that all its parts will harmonize. The power to regulate commerce, and to make all laws necessary and proper for that purpose, must be so executed as not to conflict with the prohibition against extending the judicial power beyond the prescribed limits.

It will not be pretended that Congress has the power to make any *ex post facto* law, or to lay any tax or duty on articles exported from any State, in execution of the power to regulate commerce. The prohibition in these cases is expressed; but a prohibition which is necessarily implied, is just as binding upon Congress as if it were expressed. The Constitution has made ample provision for bringing within the cognizance of the federal courts all cases which may arise under any proper regulation of commerce among the States, which may be, prescribed by Congress in the general provision, that the judicial power shall extend to all cases arising under any law of the United States.

If this law can be sustained, it is not perceived why Congress may not extend the jurisdiction of the federal courts to every case of contract or tort, growing out of the extensive trade and commerce, now carried on, by land and water, among the States of the Union; and thus draw within the cognizance of these courts one half of the litigation of the country. See opinion of Mr. J. Nelson, 6 How. 392.

The Propeller Genesee Chief et al. *v.* Fitzhugh et al.

2d. The libellants are not entitled to recover in this case upon the merits, without showing negligence on the part of the Chief, accompanied with freedom from blame on the part of the Cuba. Abbott on Shipping, 238, Perkins's Ed. 312. The burden of proving negligence is on the libellants.   2 Hagg. 145.

3rd. The Chief was without fault.   No blame or negligence can be imputed to her.

1. She was well and sufficiently manned.

2. She was well lighted, and lights were in proper places.

3. She had a competent and proper look-out.   The captain, the man at the wheel, and one on the deck were sufficient.   10 How. 585.   If the captain and the man at the wheel alone were on deck, it was a competent look-out, according to the testimony of all the nautical men in this case.

4. But if the look-out was insufficient, unless the loss can be imputed to that cause, the libellants cannot recover.   6 Law Rep. 111.

5. If the Cuba had no light in her rigging, it was not the fault of the Chief that she was not seen in time to avoid the collision.   In the absence of such light she could not have been seen from the Chief.   The smoke or haze on the water, and the position of the Cuba between the Chief and the land prevented it.

4th. The pretence that the Chief suddenly changed her course just before the collision, and swung around to the north, is without any foundation.

1. The weight of evidence is clearly against it.

2. It is improbable.   When the testimony is conflicting, the court will be guided by the probabilities of the case.   The Mary Stuart, 2 W. Rob. 244.

5th. The course of the Chief in going to the leeward was proper.   It was according to the law of the sea.   3 Carr. & Payne, 528–529; Id. 601; 3 Hagg. 321; 1 Law Rep. 313, 318.

6th. The Cuba was in fault, and her fault was the cause of the collision.

1. She was in fault in bearing away after she saw the Chief's light.   The Cuba should have kept her course, on the libellants' own showing.   If she was close-hauled she should have kept her course.   The Celt, 3 Hagg. 321, and see fol. 974 and 1312 of case.   If she had the wind three points free, then she should have passed to the right even if she had to change her course for that purpose.   1 Law Rep. 313, 318, and see testimony of Capt. Eggleston, fol. 1012.

2. The master of the Cuba say he saw the Chief coming directly towards him.   He ought to have known that it was not

38*

by design, and he should have changed his course and hung out more lights.

3. But the proof clearly shows that the Cuba was to the windward of the Chief and that she went to the leeward crossing the bows of the Chief.

4. The Cuba had no light in her rigging. The weight of evidence is against the libellants on this point.

7th. The declarations and admissions of the master are evidence against the libellants, and are to be treated as the declarations and admissions of the libellants themselves, especially as the libellants have failed to produce the protest. The Manchester, 1 W. Rob. 62; Abbott on Shipping, 380, Perkins's Ed. of 1846, 465–466; The Emma, 2 W. Rob. 315.

8th. The testimony of the principal witnesses on the part of the libellants is so far discredited that no decree ought to be predicated upon it.

1. The master is discredited by his own declarations, and this impeachment extends to the crew.

2. As to the light, the master is contradicted by Rickerby and by the men on the Chief.

3. As to the force of the wind, the distance which the Cuba sailed between 6 o'clock and the time of the collision, show most clearly that the statement of her master and Sharp cannot be true.

4. As to the course of the wind: The master and Sharp are contradicted by the men on the Chief, and by Spence, Taylor, Eggleston and Morgan.

9th. If the Cuba was in fault in either of the particulars before enumerated, the libellants cannot recover. This seems to be now the settled law in cases of collision. Rathbun *v.* Payne, 19 Wend. 399; Barnes *v.* Cole, 21 Wend. 188; Spencer *v.* Utica and S. R. R. Co. 5 Barbour, 337.

Mr. Chief Justice TANEY delivered the opinion of the court.

This is a case of collision on Lake Ontario. The libellants were the owners of the schooner Cuba, and the respondents and present appellants the master and owners of the propeller Genesee Chief. The libellants state that on the 6th of May, 1847, as the Cuba was on her voyage from Sandusky, in the State of Ohio, to Oswego, in the State of New York, the Genesee Chief, which was proceeding on a voyage up the lake, ran foul of her and damaged her so seriously that she shortly afterwards sunk, with her cargo on board; and they also allege that the collision was occasioned by the carelessness and mismanagement of the officers and crew of the propeller, without any fault of the officers or crew of the Cuba. The respondents deny that it was

occasioned by the fault of the steamboat, and impute it to the carelessness with which the schooner was managed.

The proceeding is *in rem*, and in substance as well as in form, a proceeding in admiralty. It was instituted under the act of February 26, 1845, (5 Stat. at Large, 726,) extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same. The District Court decreed in favor of the libellants, and the decision was affirmed in the Circuit Court, from which last-mentioned decree this appeal has been taken.

Before, however, we can look into the merits of the dispute there is a question of jurisdiction which meets us at the threshold. When the act of Congress was passed, under which these proceedings were had, serious doubts were entertained of its constitutionality. The language and decision of this court, whenever a question of admiralty jurisdiction had come before it, seemed to imply that under the Constitution of the United States, the jurisdiction was confined to tide-waters. Yet the conviction that this definition of admiralty powers was narrower than the Constitution contemplated, has been growing stronger every day with the growing commerce on the lakes and navigable rivers of the western States. And the difficulties which the language and decisions of this court had thrown in the way, of extending it to these waters, have perhaps led to the inquiry whether the law in question could not be supported under the power granted to Congress to regulate commerce. This proposition has been maintained in a recent work upon the jurisdiction, law, and practice of the courts of the United States in admiralty and maritime causes, which is entitled to much respect, and the same ground has been taken in the argument of the case before us.

The law, however, contains no regulations of commerce; nor any provision in relation to shipping and navigation on the lakes. It merely confers a new jurisdiction on the district courts; and this is its only object and purpose. It is entitled "An act extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same;" and the enacting clause conforms to the title. It declares that these courts shall have, possess, and exercise the same jurisdiction in matters of contract and tort, arising in or upon or concerning steamboats and other vessels of twenty tons burden and upwards, enrolled and licensed for the coasting trade, and at the time employed in business of commerce and navigation between ports and places in different States and territories, as was at the time of the passage of the law possessed and exercised by the district courts in cases of like steamboats and other vessels

employed in navigation and commerce on the high seas, or tide-waters within the admiralty and maritime jurisdiction of the United States.

It is evident, therefore, from the title as well as the body of the law, that Congress, in passing it, did not intend to exercise their power to regulate commerce; nor to derive their authority from that article of the Constitution. And if the constitutionality of this law is supported as a regulation of commerce, we shall impute to the legislature the exercise of a power which it has not claimed under that clause of the Constitution; and which we have no reason to suppose it deemed itself authorized to exercise.

Indeed it would be inconsistent with the plain and ordinary meaning of words, to call a law defining the jurisdiction of certain courts of the United States a regulation of commerce. This law gives jurisdiction to a certain extent over commerce and navigation and authorizes the court to expound the laws that regulate them. But the jurisdiction to administer the existing laws upon these subjects is certainly not a regulation within the meaning of the Constitution. And this act of Congress merely creates a tribunal to carry the laws into execution but does not prescribe them.

Nor can the jurisdiction of the courts of the United States be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the Constitution by separate and distinct grants. The extent of the judicial power is carefully defined and limited, and Congress cannot enlarge it to suit even the wants of commerce, nor for the more convenient execution of its commercial regulations. And the limits fixed by the Constitution to the judicial authority of the courts of the United States, would form an insuperable objection to this law, if its validity depended upon the commercial power.

This power is as extensive upon land as upon water. The Constitution makes no distinction in that respect. And if the admiralty jurisdiction, in matters of contract and tort which the courts of the United States may lawfully exercise on the high seas, can be extended to the lakes under the power to regulate commerce, it can with the same propriety and upon the same construction, be extended to contracts and torts on land when the commerce is between different States. And it may embrace also the vehicles and persons engaged in carrying it on. It would be in the power of Congress to confer admiralty jurisdiction upon its courts, over the cars engaged in transporting passengers or merchandise from one State to another, and over the persons engaged in conducting them, and deny to the parties

the trial by jury. Now the judicial power in cases of admiralty and maritime jurisdiction, has never been supposed to extend to contracts made on land and to be executed on land. But if the power of regulating commerce can be made the foundation of jurisdiction in its courts, and a new and extended admiralty jurisdiction beyond its heretofore known and admitted limits, may be created on water under that authority, the same reason would justify the same exercise of power on land.

Besides, the jurisdiction established by this act of Congress does not depend on the residence of the parties. And under the admiralty powers conferred on the District Courts, they are authorized to proceed *in rem* or *in personam* in the cases mentioned in the law although the parties concerned are citizens of the same State. If the lakes and waters connecting them are within the admiralty and maritime jurisdiction, as conferred by the Constitution, then undoubtedly this authority may be lawfully exercised, because this jurisdiction depends upon the place and not upon the residence of the parties.

But if the admiralty jurisdiction is confined to tide-water, the courts of the United States can exercise over the waters in question nothing more than ordinary jurisdiction in cases at common law and equity. And in cases of this description they have no jurisdiction, if the parties are citizens of the same State. This being an express limitation in the grant of judicial power, no act of Congress can enlarge it. And if the validity of the act of 1845 depended upon the power to regulate commerce it would be unconstitutional, and could confer no authority on the District Courts.

If this law, therefore, is constitutional, it must be supported on the ground that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted.

If the meaning of these terms was now for the first time brought before this court for consideration, there could, we think, be no hesitation in saying that the lakes and their connecting waters were embraced in them. These lakes are in truth inland seas. Different States border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them between different States and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered on them, and prizes been made; and every reason which existed for the grant of admiralty jurisdiction to the general government on the Atlantic seas, applies with equal force to the lakes. There is an equal necessity for the instance and for the prize power of the

admiralty court to administer international law, and if the one cannot be established neither can the other.

Again. The union is formed upon the basis of equal rights among all the States. Courts of admiralty have been found necessary in all commercial countries, not only for the safety and convenience of commerce, and the speedy decision of controversies, where delay would often be ruin, but also to administer the laws of nations in a season of war, and to determine the validity of captures and questions of prize or no prize in a judicial proceeding. And it would be contrary to the first principles on which the Union was formed to confine these rights to the States bordering on the Atlantic, and to the tide-water rivers connected with it, and to deny them to the citizens who border on the lakes, and the great navigable streams which flow through the western States. Certainly such was not the intention of the framers of the Constitution; and if such be the construction finally given to it by this court, it must necessarily produce great public inconvenience, and at the same time fail to accomplish one of the great objects of the framers of the Constitution: that is, a perfect equality in the rights and the privileges of the citizens of the different States; not only in the laws of the general government, but in the mode of administering them. That equality does not exist, if the commerce on the lakes and on the navigable waters of the West are denied the benefits of the same courts and the same jurisdiction for its protection which the Constitution secures to the States bordering on the Atlantic.

The only objection made to this jurisdiction is that there is no tide in the lakes or the waters connecting them; and it is said that the admiralty and maritime jurisdiction, as known and understood in England and this country at the time the Constitution was adopted, was confined to the ebb and flow of the tide.

Now there is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor any thing in the absence of a tide that renders it unfit. If it is a public navigable water, on which commerce is carried on between different States or nations, the reason for the jurisdiction is precisely the same. And if a distinction is made on that account, it is merely arbitrary, without any foundation in reason; and, indeed, would seem to be inconsistent with it.

In England, undoubtedly the writers upon the subject, and the decisions in its courts of admiralty, always speak of the jurisdiction as confined to tide-water. And this definition in England was a sound and reasonable one, because there was no navigable stream in the country beyond the ebb and flow of the tide; nor any place where a port could be established to carry

on trade with a foreign nation, and where vessels could enter or depart with cargoes.    In England, therefore tide-water and navigable water are synonymous terms, and tide-water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones; and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river.    Hence the established doctrine in England, that the admiralty jurisdiction is confined to the ebb and flow of the tide. In other words, it is confined to public navigable waters.

At the time the Constitution of the United States was adopted, and our courts of admiralty went into operation, the definition which had been adopted in England was equally proper here.    In the old thirteen States the far greater part of the navigable waters are tide-waters.    And in the States which were at that period in any degree commercial, and where courts of admiralty were called on to exercise their jurisdiction, every public river was tide-water to the head of navigation.    And, indeed, until the discovery of steamboats, there could be nothing like foreign commerce upon waters with an unchanging current resisting the upward passage.    The courts of the United States therefore, naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction.    It measured it by tide-water.    And that definition having found its way into our courts, became, after a time, the familiar mode of describing a public river, and was repeated, as cases occurred, without particularly examining whether it was as universally applicable in this country as it was in England. If there were no waters in the United States which are public, as contradistinguished from private, except where there is tide, then unquestionably here as well as in England, tide-water must be the limits of admiralty power.    And as the English definition was adopted in our courts, and constantly used in judicial proceedings and forms of pleading, borrowed from England, the public character of the river was in process of time lost sight of, and the jurisdiction of the admiralty treated as if it was limited by the tide.    The description of a public navigable river was substituted in the place of the thing intended to be described. And under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circumstances, to be the true description of public waters.    It was under the influence of these precedents and this usage, that the case of the Thomas Jefferson, 10 Wheat. 428, was decided in this court; and the jurisdiction of the courts of admiralty of the United States declared to be limited to the ebb and flow of the tide.

The steamboat Orleans v. Phœbus, 11 Pet. 175, afterwards followed this case, merely as a point decided.

It is the decision in the case of the Thomas Jefferson which mainly embarrasses the court in the present inquiry. We are sensible of the great weight to which it is entitled. But at the same time we are convinced that, if we follow it, we follow an erroneous decision into which the court fell, when the great importance of the question as it now presents itself could not be foreseen; and the subject did not therefore receive that deliberate consideration which at this time would have been given to it by the eminent men who presided here when that case was decided. For the decision was made in 1825, when the commerce on the rivers of the west and on the lakes was in its infancy, and of little importance, and but little regarded compared with that of the present day.

Moreover, the nature of the questions concerning the extent of the admiralty jurisdiction, which have arisen in this court, were not calculated to call its attention particularly to the one we are now considering. The point in dispute has generally been, whether the jurisdiction was not as limited in the United States as it was in England at the time the Constitution was adopted. And if it was so limited, then it did not extend to contracts for maritime services when made on land; nor to torts and collisions on a tide-water river, if they took place in the body of a country. The attention of the court, therefore, in former cases, has been generally strongly attracted to that question, and never, we believe, until recently, drawn to the one we are now discussing, except in the case of the Thomas Jefferson, afterwards followed in the steamboat Orleans v. Phœbus, as already mentioned. For, with this exception, the cases always arose on contracts for services on tide-water, or were upon libels for collisions or other torts committed within the ebb and flow of the tide. There was therefore no necessity for inquiring whether the jurisdiction extended further in a public navigable water. And following the English definition, tide was assumed and spoken of as its limit, although that particular question was not before the court.

The attention of the court was, however, drawn to this subject in the case of Waring v. Clarke, 5 How. 441, which was decided in 1848. The collision took place on the Mississippi River, near the bayou Goulah, and there was much doubt whether the tide flowed so high. There was a good deal of conflicting evidence. But the majority of the court thought there was sufficient proof of tide there, and consequently it was not necessary to consider whether the admiralty power extended higher.

But that case showed the unreasonableness of giving a construction to the Constitution which would measure the jurisdic-

tion of the admiralty by the tide.   For if such be the construction, then a line drawn across the river Mississippi would limit the jurisdiction, although there were ports of entry above it, and the water as deep and navigable, and the commerce as rich, and exposed to the same hazards and incidents, as the commerce below.   The distinction would be purely artificial and arbitrary as well as unjust, and would make the Constitution of the United States subject one part of a public river to the jurisdiction of a court of the United States, and deny it to another part equally public and but a few yards distant.

It is evident that a definition that would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible.   We have thousands of miles of public navigable water, including lakes and rivers in which there is no tide.   And certainly there can be no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public water used for commercial purposes and foreign trade. The lakes and the waters connecting them are undoubtedly public waters; and we think are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States.

We are the more convinced of the correctness of the rule we have now laid down, because it is obviously the one adopted by Congress in 1789 when the government went into operation. For the 9th section of the Judiciary Act of 1789, by which the first courts of admiralty were established, declares that the district courts " shall have exclusive cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under the laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas."

The jurisdiction is here made to depend upon the navigable character of the water, and not upon the ebb and flow of the tide.   If the water was navigable it was deemed to be public; and if public, was regarded as within the legitimate scope of the admiralty jurisdiction conferred by the Constitution.

It so happened that no seizure was made, and no case calling for the exercise of admiralty power arose for a long period of time, upon any navigable water where the tide did not ebb and flow.   As we have before stated, there were no navigable waters in the United States upon which commerce in the usual acceptation of the word was carried on, except tide-water, until the valley of the Mississippi was settled and cultivated, and steamboats invented, and no case therefore came before the court during the early period of the government that required it to determine whether this jurisdiction could be extended above tide.   It

is perhaps to be regretted that such a case did not arise. For we are persuaded that if one had occurred and attracted the attention of the court to this point before the English definition had become the settled mode of describing the jurisdiction, and before the courts had been accustomed to adhere strictly to the English mode of pleading, in which the place is always averred to be within the ebb and flow of the tide, the definition in the act of 1789, which is so evidently the correct one, would have been adopted by the courts, and the difficulty which has now arisen would not have taken place.

This legislative definition, given at this early period of the government, is certainly entitled to great consideration. The same definition is in effect again recognized by Congress by the passage of the act which we are now considering. We have therefore the opinion of the legislative department of the government, twice deliberately expressed, upon the subject. These opinions of course are not binding on the judicial department, but they are always entitled to high respect. And in this instance we think they are founded in truth and reason; and that these laws are both constitutional, and ought therefore to be carried into execution. The jurisdiction under both laws is confined to vessels enrolled and licensed for the coasting trade; and the act of 1845 extends only to such vesels when they are engaged in commerce between different States or territories. It does not apply to vessels engaged in domestic commerce of a State; nor to vessels or boats not enrolled and licensed for the coasting trade under the authority of Congress. And the State courts within the limits embraced by this law exercise a concurrent jurisdiction in all cases arising within their respective territories, as broadly and independently as it is exercised by the old thirteen States, (whose rivers are tide-waters,) and where the admiralty jurisdiction has been in full force ever since the adoption of the Constitution.

The case of the Thomas Jefferson did not decide any question of property, or lay down any rule by which the right of property should be determined. If it had, we should have felt ourselves bound to follow it notwithstanding the opinion we have expressed. For every one would suppose that after the decision of this court, in a matter of that kind, he might safely enter into contracts, upon the faith that rights thus acquired would not be disturbed. In such a case, *stare decisis* is the safe and established rule of judicial policy, and should always be adhered to. For if the law, as pronounced by the court, ought not to stand, it is in the power of the legislature to amend it, without impairing rights acquired under it. But the decision referred to has no relation to rights of property. It was a question of jurisdiction only, and the

judgment we now give can disturb no rights of property nor interfere with any contracts heretofore made. The rights of property and of parties will be the same by whatever court the law is administered. And as we are convinced that the former decision was founded in error, and that the error, if not corrected, must produce serious public as well as private inconvenience and loss, it becomes our duty not to perpetuate it.

The principal objection made to the admiralty jurisdiction is the want of the trial by jury. And it is this feature in the admiralty practice which made it the object of so much jealousy in England in the time of Lord Coke, and enabled him to succeed in his efforts to restrict it to very narrow limits. But experience in England has proved that a wider range of jurisdiction was necessary for the benefit of commerce and navigation; and that they needed courts acting more promptly than courts of common law, and not entangled with the niceties and strictness of common-law pleadings and proceedings. And during the reign of the present Queen, the admiralty jurisdiction has been extended to maritime services and contracts and to torts in navigable waters, although the place where the service was performed or the contract made or the tort committed, was within the body of a county, and within the jurisdiction of the courts of common law. A concurrent jurisdiction is reserved to the last-mentioned courts, if the party complaining chooses to select that mode of proceeding. But in the new and extended jurisdiction of the English admiralty, the old objection remains, and neither party is entitled to a trial by jury. The court in its discretion may send the question of fact to a jury, if it thinks proper to do so. But the party cannot demand it as a matter of right. Yet the English people have certainly lost nothing of their attachment to the trial by jury since the days of Lord Coke. And this recent and great enlargement of the admiralty power is strong proof that the want of it has been felt, and that experience has shown its necessity where the interests of an extensive commerce and navigation are concerned.

But the act of Congress of which we are speaking is free from the objection to which the English statute is liable. Like the English statute, it saves to the party a concurrent remedy at common law in any court of the United States or of a State which may be competent to give it. But it goes farther. It secures to the parties the trial by jury as a matter of right in the admiralty courts. Either party may demand it. And it thus effectually removes the great and leading objection, always heretofore made to the admiralty jurisdiction.

The power of Congress to change the mode of proceeding in this respect in its courts of admiralty, will, we suppose, hardly

be questioned. The Constitution declares that the judicial power of the United States shall extend to "all cases of admiralty and maritime jurisdiction." But it does not direct that the court shall proceed according to ancient and established forms, or shall adopt any other form or mode of practice. The grant defines the subjects to which the jurisdiction may be extended by Congress. But the extent of the power as well as the mode of proceeding in which that jurisdiction is to be exercised, like the power and practice in all the other courts of the United States, are subject to the regulation of Congress, except where that power is limited by the terms of the Constitution, or by necessary implication from its language. In admiralty and maritime cases there is no such limitation as to the mode of proceeding, and Congress may therefore in cases of that description, give either party right of trial by jury, or modify the practice of the court in any other respect that it deems more conducive to the administration of justice. And in the proceedings under the act of 1845, the right to a trial by jury is undoubtedly secured to either party if he thinks proper to demand it.

In the case before us, no jury was required by the libellants or respondents, and the questions of fact as well as of law were therefore decided by the court.

This brings us to the evidence in the case. And it remains to inquire whether the collision in question was the result of inevitable accident, and if not, by whose fault it happened.

Many witnesses, it appears, were examined. And, as almost invariably happens in cases of this kind, there is a great deal of contradictory testimony — the men belonging to one boat differing, for the most part, from those in the other. It has been examined with great care in the argument at the bar, and fully discussed, and we do not deem it necessary, in this opinion, to go over the whole ground, and compare the relative credit of the witnesses, or the weight and authority to which they are severally entitled.

There are some leading facts in the case which, upon the whole testimony, are free from doubt. The collision took place in the open lake. It was a starlight night, and although there was a haze near the surface of the lake, it was not sufficient to conceal the Cuba from those on board of the propeller. She had a light on her bowsprit, and was seen from the steamboat when she was four or five miles off. And the helmsman of the propeller states that it was at no time so thick as to prevent him from seeing the light at the distance of half a mile. The wind was light, moving the Cuba, which was heavily laden, not more than two or three miles an hour. The lake was smooth. The steamboat had the entire command of her course and a

wide water, by which she might have passed the Cuba on either side, and at a safe distance.    She was going at the rate of eight miles an hour.    And if proper care had been taken on board the Genesee Chief, after the schooner was first seen, it would seem to be almost impossible that a collision could have happened with a vessel moving so slowly and sluggishly through the water, even if she was carelessly or injudiciously managed.    There was no necessity for passing so near to her as to create the hazard.    The steamboat could choose its own distance, and might have approached her slowly and cautiously, if the intervening mist obscured the light after she was first discovered, or occasionally concealed it.

But there is is no evidence of any fault on the part of the Cuba.    She changed her course, it is true, when she was some miles distant from the propeller.    But a vessel close-hauled with a baffling wind cannot always choose her course, but may be compelled to change it by a slight change in the wind.    And the captain states that the course was altered because he observed her sails to be shaking, and the change was necessary to enable her to preserve her headway.    And this change was made when she was distant some miles, and there was ample time for those on board the propeller to observe it, and ample room to guard against it.    And the captain and crew of the Cuba appear to have been watchful and attentive from the time the propeller was discovered.    Nor do we deem it material to inquire whether the order of the captain at the moment of collision was judicious or not.    He saw the steamboat coming directly upon him; her speed not diminished; nor any measures taken to avoid a collision.    And if, in the excitement and alarm of the moment, a different order might have been more fortunate, it was the fault of the propeller to have placed him in a situation where there was no time for thought; and she is responsible for the consequences.    She had the power to have passed at a safer distance, and had no right to place the schooner in such jeopardy, that the error of a moment might cause her destruction, and endanger the lives of those on board.    And if an error was committed under such circumstances it was not a fault.

As regards the strength and direction of the wind, the testimony of those on board of the schooner is entitled to much more weight than the witnesses who were on board the steamboat. The movements of the latter were independent of the wind. There was nothing to attract the attention of the captain or crew to the light land breeze that was then blowing.    But the movements of the Cuba depended upon it, and the attention of those on board of her was necessarily drawn to it every moment. And while we see nothing to censure in the conduct of the

schooner, there is conclusive evidence of great carelessness on board of the Genesee Chief.

It is possible that their conduct may in some measure be accounted for by the fact, that the captain and helmsman made up their minds, when the light in the Cuba was first seen, that she was bound up the lake, and they would seem to have acted upon that opinion up to the moment of the collision. They may have believed that as they were running on the same course, and as the helmsman supposed with a four mile wind, there could be no danger of a sudden encounter, and that when they neared her, there would be time enough to change the course of the steamboat, and pass at a safe distance. It would seem difficult otherwise to account for the careless manner in which the light of the Cuba was observed even by the helmsman, for he says he saw it at intervals as the vessels were approaching each other, and lost sight of it for three or four minutes immediately before they came together. Now the light was seen at the distance of four or five miles in the first instance, and he states, in his subsequent testimony, that there was not haze enough on the lake to prevent him from seeing it at the distance of half a mile. There was, therefore, nothing to prevent him, when the vessels were within that distance, from seeing it continually if he looked for it, unless he was prevented by the position in which he placed himself in the wheel-house. And if the light was hidden by the haze, still, as he knew that a vessel was ahead and so near, nothing could excuse the rashness of continuing the steamboat at her full speed, if he supposed the schooner was meeting him, and not running on the same course.

If this mistake continued until the collision was about to take place, it would be the strongest proof of negligence, as there was abundance of time to have discovered their error. But however this may be, it is evident that there was not a proper look-out on board of the propeller. By a proper look-out we do not mean merely persons on deck, who look at the light; but some one in a favorable position to see, stationed near enough to the helmsman to communicate with him, and to receive communications from him, and exclusively employed in watching the movements of vessels which they are meeting or about to pass. And it appears that the helmsman saw no one, after he and the captain first observed the light of the Cuba, until the vessels met. The captain had not observed her near approach, for when the collision happened he ran to the wheel-house to inquire what was the matter. And when the steersman, by his own imperfect observation, saw that the danger was imminent, and it was absolutely necessary that the speed of the boat should be

instantly checked, nobody else appears to have seen it, and no one was near him, and he was forced to leave the wheel at the most critical moment in order to ring the bell to reverse the engine. The fact that there was no one near him to whom he could call, and no one but himself that saw the danger, is conclusive evidence of the carelessness with which the Genesee Chief was proceeding. She was running at her usual speed, although the captain knew, half an hour before, that there was a vessel in his path, and caution therefore necessary; and the more necessary if the haze obscured the light of the schooner, as some of the witnesses represent.

It is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant look-out besides the helmsman. It is impossible for him to steer the vessel and keep the proper watch in his wheel-house. His position is unfavorable to it, and he cannot safely leave the wheel to give notice when it becomes necessary to check suddenly the speed of the boat. And whenever a collision happens with a sailing vessel, and it appears that there was no other look-out on board the steamboat but the helmsman, or that such look-out was not stationed in a proper place, or not actually and vigilantly employed in his duty, it must be regarded as *primâ facie* evidence that it was occasioned by her fault. She has command of her own course and her own speed; and it is her duty to pass the approaching vessel at such a distance as to avoid all danger where she has room; and if the water is narrow, her speed should be checked so as to accomplish the same purpose. In the present case every proper precaution seems to have been neglected. No pains were taken to ascertain the course of the Cuba; there was no one upon the look-out but the helmsman, and that duty negligently performed by him; and in a starlight night, with four or five miles of deep water on the one side and the open lake on the other, with a light breeze and smooth surface, she run into and sunk a vessel that had been seen half an hour before, at a distance of four or five miles, and which was sailing at the rate of not more than two or three miles an hour, and doing every thing in her power to warn those on board the steamboat of her position and her danger. We are satisfied, from the whole testimony, that there was great and inexcusable carelessness on the part of the propeller, and that the damages are not higher than the loss requires.

The decree of the Circuit Court must therefore be affirmed with costs.

Mr. Justice DANIEL.

From so much of the opinion just announced as claims juris-

diction in this case, and especially from the ground (for the first time assumed in this court) as the principal foundation of that jurisdiction, I find myself constrained to declare my dissent. It is not my purpose here to reiterate my views of the extent of the admiralty powers vested by the Constitution in the courts of the United States, nor of the sources from which those powers were conceived by the framers of the Constitution to have been derived. Those views have, on former occasions, been fully developed, particularly in the case of the New Jersey Steam Navigation Co. *v.* The Merchants Bank, in 6 How. 344, in my concurrence with the opinion of the late Justice Woodbury, in the case of Waring *v.* Clark, 5 How. 441, and in my opinion in the case of Newton *v.* Stebbins, 10 How. 586.

The decisions of this tribunal heretofore made, will, upon a correct examination of them, be found to rest the admiralty powers of the federal courts, not solely upon the known and established principles and limitations of the powers and jurisdiction of the admiralty in England, principles and limitations settled in that country at the time of the adoption of the federal Constitution, and rigidly adhered to there until altered by some recent legislative provisions; but they have professed to place those powers upon some supposed enlargement of the admiralty jurisdiction, said to have sprung from the practice of the vice-admiralty courts in the British colonies; a practice which, whilst it has been alleged as a justification of each instance in support of which it has been invoked, no case, no investigation has ever been able to place upon any clear and indisputable authority. It is against this undefined and undefinable warrant for the exercise of power that the objections urged by me on former occasions have been levelled. Moreover it has always seemed to me to imply a palpable contradiction, that there should be ascribed (and that by mere implication) to the vice-admiralty courts, (the creatures of the high admiralty) powers which the latter confessedly never possessed. But the doctrine at present promulged by this court, is based upon assumptions still more irregular in my view, still more dangerous than that above adverted to, because it claims for this court, wholly irrespective either of the Constitution or the legislation of Congress, powers to be assumed and carried into execution by some rule which in the judgment of this court is to be applied according to its own opinions of convenience or necessity. Thus it is admitted that by the decisions in England, the jurisdiction of the admiralty did not reach *infra corpus comitatus*, and was limited to the ebb and flow of the tide; and it is admitted that by the previous decisions of this court the like limitations were imposed on the jurisdiction of the admiralty in this country; and even this limitation, imposed

The Propeller Genesee Chief et al. v. Fitzhugh et al.

by former decisions of this tribunal, it is obvious, allowed of some encroachment upon the common-law jurisdiction, in so far as the ebb and flow of the tide might bring the asserted power of the court *infra fauces terrae*, or *infra corpus commitatus*. But even this encroachment is not sufficient to satisfy the aspirations of the jurisdiction, now for the first time asserted; for now it is insisted that any waters, however they may be within the body a State or county, are the peculiar province of the admiralty power; and although it is admitted that the power was once clearly understood as being limited to the ebb and flow of the tide, yet now, without there having been engrafted any new provision on the Constitution, without the alteration of one letter of that instrument, designed to be the charter of all federal power, the jurisdiction of the admiralty is to be measured by miles, and by the extent of territory which may have been subsequently acquired; a much less natural standard surely, than the nature and character of the element to which the admiralty is peculiarly adapted, and to which it owes its origin; that the Constitution may, nay must be altered by the same process, and must be enlarged not by amendment in the modes provided, but according to the opinions of the judiciary, entertained upon their views of expediency and necessity. My opinions may be deemed to be contracted and antiquated, unsuited to the day in which we live; but they are founded upon deliberate conviction as to the nature and objects of limited government, and by myself at least cannot be disregarded; and I have at least the consolation — no small one it must be admitted — of the support of Marshall, Kent, and Story in any error I may have committed. I cannot construe the Constitution either by mere geographical considerations; cannot stretch nor contract it in order to adapt it to such limits, but must interpret it by my solemn convictions of the meaning of its terms, and by what is believed to have been the understanding of those by whom it has been formed. In the view taken by the court of the evidence in this case, I entirely concur.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the Northern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause, be, and the same is hereby affirmed with costs and damages, at the rate of six per centum per annum.