---

THE ANT.

*(District Court, D. New Jersey.* February 3, 1882.)

1. COLLISION.
    A steamer with a long tow, about to pass another steamer, also with a tow, is
    bound to avoid the latter.

2. SAME—LOOKOUT.
    Steamers navigating on the thoroughfares of commerce are bound to have a
    lookout, independently of the helmsman.

3. SAME—LIGHTS.
    Steam-vessels, "when towing other vessels," must exhibit two bright white
    mast-head lights vertically, in addition to their side lights; and all vessels,
    whether steam or sail vessels, when lying at anchor in roadsteads or fair-ways,
    must exhibit a white light in a globular lantern at a height not exceeding 20
    feet above the hull. In navigation a vessel aground is in circumstances sim-
    ilar to a vessel at anchor, and a steamer aground should exhibit the single light
    required of steamers at anchor.

4. DAMAGES DIVIDED.
    Where both steamers contributed to the collision the damages will be divided.

In Admiralty. Libel *in rem.*

*Beebe, Wilcox & Hobbs,* for libellants.

*S. H. Valentine,* (with whom was *R. D. Benedict,*) for claimants.

NIXON, D. J. The libel is filed in this case to recover damages
arising from a collision which took place about 2:30 o'clock on the
morning of June 2, 1881, between Robbins' reef and Bedloe's island,
on the westerly side of the channel, in the bay of New York, between
the street department scows in tow of the tug-boat Ant and the tug-
boat' C. J. Saxe, and two pontoons or wreckers in the tow of the said
Saxe.

It appears from the allegations of the libel and the proofs that the canal-boat Chandler, loaded with upwards of 200 tons of anthracite coal, and while, with other boats in tow of the steamer Saxe, on a trip from Port Johnson across the bay, being overtaken by a storm foundered and sunk in the neighborhood of Robbins' reef. The owners of the Saxe purchased the sunken boat and her cargo while in this condition, and employed wreckers to raise her. Pontoons were placed on either side of the boat, and four chains were passed under her and tightened by jack-screws on the pontoons. When the tide was low she was lifted from the bottom by the rising of the tide, and was towed by the Saxe, stern foremost with the pontoons, about a mile up the bay, at high water. The bow of the canal-boat again struck the bottom, which stopped their further progress. Being obliged to remain here until the next full tide, the steamer Saxe having the tow in charge dropped back on the east side of the easterly pontoon and made fast, her bow still facing up the river. She then took down her bow and side lights, and set vertically on her flag-staff two white lights, about 15 feet above her deck. One white light was also placed on each of the pontoons on the bow of the west boat, and on the stern of the east one from 10 to 12 feet in height.

On the same morning, at about a quarter of 10 o'clock, the steam-tug Ant left the foot of Thirty-third street, East river, with two street-department scows, loaded with dirt and garbage, in tow by a hawser, bound for the dumping-grounds outside of Sandy Hook. The tug was about 65 long; the hawser leading to the first scow, 500 feet; the hawser from the first to the second scow, 40 feet; and each scow from 75 to 80 feet in length,—making the total length of the tug and her tow upwards of 700 feet. It was a moderately clear, pleasant night; several of the witnesses testifying that vessels could be seen a mile away without lights. The tide was at the strength of the ebb. The Saxe and her tow did not come under the particular observation of the master and pilot of the Ant until they were within a half or three-quarters of a mile distant. The testimony is very conflicting as to the precise distance. Seeing the two vertical white lights on the Saxe and no bow or side lights, he concluded that it was a steamer with a tow, going in the same direction with the Ant. He continued his course, bearing directly upon the Saxe, until he approached her within a few hundred feet.

From the contraditory statements of the witnesses of the respective parties it is quite impossible to tell how near he had come before he

ascertained that the Saxe was not in motion. The master testifies that he did not find out that she was at anchor until he was "right along-side." As soon as he discovered that, he put his helm hard a-starboard, bringing his boat to the east, across the bow of the Saxe, and easily clearing her. The scows, however, being under considerable headway, and carried onward also by the strength of the tide, did not readily yield or respond to the changed course of the tug. The foremost one followed the Ant to the east, barely escaping the easterly pontoon, and struck the bow of the Saxe. The rear scow drifted to the west, and came in collision with the western pontoon. When the master of the Ant first perceived that one of the scows was going to the east and the other to the west of the Saxe and the pontoons, he reversed his engine, and slacked up the hawser, "to give the scows a chance," he says, "to go around if they would." When he found that they would not go around he seems to have hooked up his engine again with the inexplicable intention of disengaging the scows from the pontoons by main force, and pulled upon the entangled mass of boats with such energy that the position of the Saxe and the pontoons was so changed that, instead of lying north and south with the tide, they were turned across the bay from east to west. The last scow had drifted around the bow of the western pontoon, and had engaged with the chain under the bow of the canal-boat. In the violence of the effort of the Ant to get clear, the bow of the Chandler, being aground, was torn away, and some of the timbers and portions of the deck came up, floating on the surface of the water. The libel is filed to recover the damages done to the Chandler, and for the loss of a part of the cargo, consequent upon the injury to the hull.

Two questions at once suggest themselves for consideration:

(1) Was there such carelessness and want of skill in the navigation of the Ant as to cause the collision?

(2) Did the lights exhibited by the C. J. Saxe mislead the Ant and thus contribute to the disaster?

1. I have no doubt about the legal liability of the Ant. It was her duty, being the following steamer, to keep out of the way of the libellant. The tow of the Saxe was aground and helpless, lying on the westerly side of the usual channel down the bay. The weather was favorable for safe navigation. There was not enough wind to excite remark or attract observation on either side. The night was clear, or only slightly obscured, at most, by drifting clouds. There was ample room for the Ant to pass on either side, and no valid

excuse appears why she suffered herself to approach so near to the libellant as to render a collision unavoidable. Upon any theory of the case suggested she was in fault. Being a steamer with a long tow, about to pass another steamer, also with a tow, she ought to have avoided the latter. The excuse rendered by the master for not doing so is that he thought the Saxe was in motion, moving to the south. But vigilance and care on his part would have undeceived him some time before he came so near. He depended upon himself and not upon a lookout; and yet the ascertaining of such facts falls within the proper duties of a lookout. The obligation to have one, independent of the helmsman, on board of steamers navigating in the thoroughfares of commerce, has been so often reiterated by the supreme court that it is no longer an open question. *St. John* v. *Paine,* 10 How. 558; *Newton* v. *Stebbins,* Id. 607; *The Genesee Chief,* 12 How. 462; *The Catharine,* 17 How. 177; *Chamberlain* v. *Ward,* 21 How. 548; *Haney* v. *Steam-packet Co.* 23 How. 293; *The Ottawa,* 3 Wall. 268.

In *St. John* v. *Paine, supra,* Mr. Justice Nelson, speaking for the court, (p. 585,) said:

"We are satisfied that the steam-boat was in fault in not keeping at the time a proper lookout on the forward part of the deck, and that the failure to descry the schooner at a greater distance than half a mile ahead, is attributable to this neglect. The pilot-house, in the night, especially if dark, and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. The view of a lookout stationed there must necessarily have been partially obstructed. A competent and vigilant lookout, stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching, at the earliest moment, is indispensable to exempt the steam-boat from blame in case of accident in the night-time, while navigating waters in which it is accustomed to meet other water-craft."

And in *The Genesee Chief, supra,* Chief Justice Taney states the law as follows:

"It is the duty of every steam-boat traversing waters where sailing-vessels are often met with to have a trustworthy and constant lookout, besides the helmsman. It is impossible for him to steer the vessel and keep the proper watch in his wheel-house. His position is unfavorable to it, and he cannot safely leave the wheel to give notice when it becomes necessary to check suddenly the speed of the boat. And whenever a collision happens with a sailing-vessel, and it appears that there was no other lookout on board the steam-boat but the helmsman, or that such lookout was not stationed in the proper place, or not actually and vigilantly employed in his duty, it must be regarded as *prima facie* evidence that it was occasioned by her fault."

These observations are pertinent to the case under consideration. I am aware that the absence of a lookout is unimportant in all cases where the collision arose from other causes, and such absence did not contribute to the loss or disaster. But it cannot be safely affirmed here that the collision is not directly traceable to the neglect in not having a vigilant lookout. It is true that the master in the wheel-house saw the Saxe and her tow when distant from a quarter to a half a mile—none too soon, with her tow of nearly an eighth of a mile in length, to have avoided her if he had begun at once to make preparations to do so; but, perhaps, soon enough. He made no attempt, however, although having abundance of room on either side, to get out of the way, but continued for six or seven minutes to bear directly upon the Saxe, and did not determine she was stationary until he came within a few hundred feet of her. He then starboarded his helm—a movement which enabled his tug to escape; but any skilful navigator must have known that the momentum of the tow and the force of the tide rendered it impossible for him to pull his tow through without colliding. It was still more faulty navigation, in my judgment, after slacking his speed and finding out that his tow had become entangled with the tow of the Saxe, that he should hook up his engine and endeavor by main force to disentangle them. The damage was caused by this movement, and I have no doubt about the unskilfulness, negligence, and fault of the master of the Ant, and hence the responsibility of the claimants to answer for the damage.

2. Whether the lights exhibited by the Saxe misled the Ant, and thus contributed to the disaster, is a more difficult question to determine. It depends upon the construction to be given to the rules prescribed by congress to prevent collisions on the water. These are found in section 4233 of the Revised Statutes.

The following are the only rules that seem to have any bearing upon the present case:

The *second* is that "the lights mentioned in the following rules, and *no others*, shall be carried in all weathers, between sunset and sunrise." The *fourth* requires that "steam-vessels, when towing other vessels, shall carry two bright white mast-head lights, vertically, in addition to their side lights, so as to distinguish them from other steam-vessels." The *fifth* is that "all steam-vessels, other than ocean-going steamers and steamers carrying sail, shall, when under way, carry on the starboard and port sides lights of the same character and construction, and in the same position as are prescribed for side lights by rule 3." The *tenth* is that "all vessels, whether steam-vessels or sail-vessels, when at anchor in roadsteads or fair-ways, shall, between sun-

set and sunrise, exhibit where it can best be seen, but at a height not exceeding 20 feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken ·ight, visible all around the horizon, and at a distance of at least one mile." The *twelfth* rule relates to canal-boats, oyster-boats, rafts, or other water-craft, and requires, whether such boats are navigating the waters or lying at anchor, that they shall carry one or more good white lights, which shall be placed in the manner prescribed by the board of supervising inspectors of steam-vessels.

The advocates for the claimants insist that the two white vertical lights on the steamer told a false story; that the true construction of the fourth rule requires the vessel with such signals to be in motion, and that only one light should have been shown after the tow had arrested her progress by grounding on the bottom; that the only inference to be drawn from seeing the two vertical lights aloft, and no green and red side lights on the starboard and larboard sides, was that the steamer was towing other vessels down the bay; and that, if such inference had been correct, the collision would not have occurred.

The advocates for the libellants, on the other hand, contend that the fourth rule prescribes that the two vertical lights shall be shown by a steamer when engaged in towing, whether in motion or not; that such lights do not necessarily imply their locomotion, but their occupation; that if temporarily stopped by touching the bottom, neither the law nor the practice of navigation requires the double light to be taken down, but to be left burning, so that all approaching vessels may understand that not only the steamer, but her tow, is to be avoided.

The expert testimony is, of course, conflicting; about an equal number of pilots on each side testifying that the customary and practical interpretation of the rule is in favor of the party which produced them. For instance, Van Deventer, an experienced pilot offered by the libellants, says that in his long experience the only significance he ever knew to be attached to two vertical white lights on the flag-staff of a steamer was that she was a tug-boat having a tow to a hawser. On the contrary, Mr. Gilkinson, speaking as a pilot for the claimants, says that if, while descending the river at night, he saw ahead of him two vertical lights, one over the other, as if on a flag-staff, and on the starboard side of the boat two lights nearer the water, he would understand there was a tow going the same direction with him down the river. And there seems to be a like contrariety

of opinion on the question whether a steamer having a tow and running aground in a public thoroughfare for vessels should continue to exhibit the two white vertical lights, according to the requirements of the fourth rule, or the single white light prescribed by the tenth rule for all vessels lying at anchor in roadsteads. All the pilots who were interrogated on the subject by the libellants considered it their duty to leave the two lights up after grounding, and all who were examined by the claimants were equally positive that custom and good naviga-, tion demanded that one should be taken down.

I get quite as little information from any judicial construction. The fourth and tenth rules, as they appear in section 4233, were originally enacted by congress as the fourth and seventh, in the act of April 29, 1864, (13 St. at Large, 59,) and, if possible, must be so construed that both may stand. The fourth prescribes the proper lights for steam-vessels "when towing other vessels;" the tenth, the light that must be exhibited by all vessels, whether steam or sail-vessels, "when lying at anchor in roadsteads or fair-ways." In the one case, there must be "two bright white mast-head lights, vertically, in addition to their side lights." In the other, "a white light in a globular lantern at a height not exceeding 20 feet above the hull."

There is much force in the suggestion of the advocates of the libellants, that the object and purpose of the fourth rule is disclosed in the rule itself. Why should steam-vessels, when towing other vessels, carry two white vertical lights? The rule says, "to distinguish them from other steam-vessels," and not to show that they are in motion. It is important that they should be distinguished from other vessels, from the fact that a steamer with a tow is more helpless and unwieldly than one not thus encumbered, and more care is demanded on the part of vessels meeting or passing them. The rule was adopted from the English act, and support is given to this construction by the observations of Sir Robert Collier, in the case of *The American and the Syria*, L. R. C. P. C. 131. Speaking for their lordships in privy council, on appeal, and considering the provisions of the rule, he said:

"In 1863 an additional article [the rule in question] was promulgated, requiring the towing steamer to exhibit two white lights instead of one; doubtless for the purpose of warning all approaching vessels that she was encumbered, and not in all respects mistress of her movements."

But while this was, without doubt, one purpose of the rule, it is not, in my judgment, the only purpose. It is fairly to be inferred

from its phraseology, interpreted in the light of the provisions of the tenth rule, that the two white vertical lights also signify that the tow is in motion. In navigation, a vessel aground is in circumstances quite similar to a vessel at anchor; and the spirit, if not the letter, of the two rules is best ascertained by holding that a steamer with a tow, whether aground or at anchor, should exhibit the single light required by the tenth rule.

The Ant was misled by the double vertical lights, and was brought into much closer proximity to the tow than she probably would have come if she had been advised by a single light that the Saxe was not in motion. The testimony shows such ignorant or negligent navigation on the part of the master of the Ant that it is doubtful whether he would have cleared the Saxe on an exhibition of the legal signal; but, under the circumstances, I think the claimants are entitled to the benefit of the doubt.

As the Saxe thus contributed to the collision, I must hold her also in fault, and order the damages to be divided; and a decree will be entered accordingly.