STAPLES, J.,
delivered the opinion of the court.
The original bill in this case was filed in June, 1876, in the circuit court of Alexandria, by John G. Graham, on behalf of himself and other creditors, against The Washington City, Virginia Midland and Great Southern Railroad Company. After setting out the several deeds of trust constituting liens on the road, the bill charges the insolvency of the company. It alleges that the *current net revenues of the road are insufficient to satisfy the annual interest upon its indebtedness. And it asks that a receiver be appointed by the court to take charge of the property, to collect its rents, tolls, income, and profits; that an account of the assets be taken, a sale of the property be ordered, and a proper distribution of the proceeds be made, and for general relief.
On the 13th of July, 1876, an order was entered in the cause conformably to the prayer of the bill, enjoining the company from further operating the road, and ap-po'nting John S. Barbour receiver.. Other orders were entered from time to time, but they need not be specially mentioned here, as they have no material bearing upon the matters in controversy.
In the progress of the cause one of the appellants (The Abott Iron Company) filed its petition asking to be paid a balance of about $13,000 due that company for iron rails furnished the railroad company in May and July, 1875, which rails were in use at the time of the appointment of the receiver.
The reason assigned by the officers of the company for the failure to pay this claim, was that after paying for labor and material to operate the road, they were compelled to reserve its revenues to pay past due interest on the company’s mortgage debts.
The other appellants -also filed petitions asking to be paid for lumber furnished, and for services rendered as employees of the company prior to the appointment of receiver. All the claims thus asserted against the company for material and supplies furnished, and for salaries and wages of employees, amount to about $244,000, exclusive of interest.
Upon this state of facts the question arises whether these claims, not having been paid by the company out of the current revenues of the road, as they ought *to have been paid, are now entitled to be paid from the net revenues in the hands of the receiver in preference to the debts due the mortgage creditors.
The appellees’ contention (to state the proposition in general terms) is that when the mortgagee takes possession of the mortgaged estate, he is entitled, as incident thereto, to the rents and profits, to be applied in satisfaction of his debt; that by the appointment of a receiver the court takes possession for him; that the order of appointment is in the nature of an equitable execution for his benefit; and the appellants being merely creditors at large, without a lien upon the earnings of the road in the hands of a receiver, cannot legally claim they shall be applied to the payment of unsecured debts.
On the other hand, it is insisted for the appellants, that the common law doctrines relating to ordinary mortgages of real estate cannot be looked to for analogies and precedents to guide the courts in the interpretation and effect to be given to mortgages of railroad property; that the latter are comparatively of modern origin and development, and the jurisdiction of the equity courts in the appointment of receivers in such cases must be exercised with reference to the rights not only of the mortgage creditors, but of the other creditors having equal or superior equities.
In illustration of this point, it is said that in the case of an ordinary mortgage, the creditor, as a general rule, does not so much rely on the rents and orofits as upon the corpus of the estate; that repairs and improvments are not essential to his security, they are not invited by him, and he cannot be held to have authorized them by his silence or his acquiescence.
With respect to a railroad mortgage the case is entirely different. If the mortgage debt is ever paid it must be from the earnings of the road. If there is *a foreclosure and sale and the road is purchased by the mortgage creditor, as is usually done, his reliance is at last upon the tolls and earnings. That constant repairs, replacements, and additional equipments are necessary, which must first be paid for before *552 the mortgage creditor is entitled to anything; and in taking the mortgage he impliedly agrees that the current deb ts made in the ordinary course of business shall bepaid from the current receipts before he has any claim upon the income; and if not so paid before the appointment of a receiver, they ought to be paid within reasonable limits from the net income of the road after such appointment. To sustain these positions the counsel rely upon some recent decisions of the courts, especially the cases of Fosdick v. Schall, 9 Otto 235, and Hale v. Frost, reported in the same volume, as laying down a different rule with respect to railroad mortgages, and as fully sustaining the appellants’ pretensions. These decisions, it is claimed, ought to be regarded as binding authority because they were made after a general invitation to the bar of that court interested in like cases to present briefs on the subject; and after a most patient hearing and the most searching and able arguments from the best legal minds of the country, the court arrived at unanimous conclusion on the subject. Opinion of Hughes, J., in Atkins & Co. v. Petersburg Railroad Company, 3 Hughes’ R. 313.
In the first-named case, Fosdick v. Schall, Chief-Justice Waite, speaking for the whole court, lays down the following proposition:
“When a court of chancery is asked by railroad mortgagees to appoint a rece;ver pending proceedings for foreclosure, the court in Jhe exercise of a sound discretion may as a condition of issuing the necessary order impose such terms.in reference to the payment from the income during the receiver-ship of outstanding *debts for labor, supplies, equipments, or permanent improvements of the mortgaged property, as may under the circumstances of the particular case appear to be reasonable. If no such order is made at the time -the receiver is appointed, it may be done at any time during the progress of the cause, if required in the due administration of justice and the enforcement of the equities of the respective parties.
“When the current earnings of a railroad, which ought in equity to have been employed to pay current debts contracted before the receiver’s appointment for labor, supplies, and the like, have been'applied by the company to- the payment of interest due mortgage creditors, to pay for additional equipments for the road, or for valuable and lasting improvements, it is competent for the court to restore what has been thus improperly diverted, and to direct such current debts to be paid out of the income in the receiver’s hands before anything derived from that source goes to the mortgage creditors.
“This doctrine of restoration of- the fund rests not upon any ground of a supposed lien of the supply or labor creditor upon the earnings of the road, but upon the idea that the officers of the company are in a sense trustees of these earnings, for the benefit of the different claims of creditors, and if they gave to one class of creditors that which properly belongs to another, the court may, upon an adjustment of accounts, so use the income in its hands as to restore, if practicable, the parties to their original rights.”
These principles, as applied to railroad-mortgages, thus laid down by the supreme court of the United States, appear to have commended themselves generally to the courts and the profession throughout the country.
*It will be observed that in the opinion of the supreme court the right of the supply and labor creditor to payment from the funds of the receivership is not limited, as some have supposed, to a restoration of the amount paid to mortgage creditors in the way of interest; but whenever it appears that additional equipments have been provided for the road, and permanent improvements made, from the earnings in the hands of the company, leaving the supply and labor debts unpaid, it is in the power of the court to use the income of the receivership in paying such debts, and thus restore what has been improperly diverted. So that a diversion from the labor and supply creditor may occur as well in paying for equipments and improvements as in paying the mortgage creditors; and this upon the obvious ground that without supplies and labor the business of the road cannot be carried on, and the mortgage creditor in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be first paid from the current receipts.
If any reasonable doubt could be entertained of the extent and meaning of the decision in Fosdick v. Schall, it is set at rest by the subsequent case of líale v. Frost, decided by the same court a short time after-wards; reported also in 9 Otto 389. In that case the court unanimously affirmed the following principles as governing in these cases: The net earnings of the road while in the possession of the court and operated by its receiver are not necessarily and exclusively the property of the mortgagees, but are subject to the disposal of the chancellor in the payment of claims which have superior equities, if such shall be found to p'-'st; and. further, that the petitioners’ claims in this case have superior equities to those of the mortgagees. Let us see what was the character of the debts thus allowed in preference to the mortgage liens. The claim of the *car-spring manufacturing company was for car-springs and spirals sold the railroadcompanyinMarchandApril before the receiver was appointed. The claim of Hall, Ayer & Co. was for supplies to the machinery department and for material for construction purposes furnished two years or more before the appointment of the receiver.
The supreme court of the United States rejected the claim on account of material for construction purposes. The case as reported does not show the reasons; but one of the counsel for the appellants states in his brief, it appears from the original record “that this material was used in the construction of an independent branch road, and therefore the debt did not come under the influence of the principle governing this class of cases.”
It is not at all immaterial because the *553 supreme court directed payment of the claim for car-springs and spirals, and of the claim for supplies to the machinery department of the road to be paid from earnings in the hands of the receiver in preference to the claims of the mortgage creditors. It is not pretended there was any diversion in that case in favor of those creditors, because the company had paid no interest since the year 1873.
It seems, however, that there was a floating debt of $1,600,000, contracted in previous years, for equipment and construction, repairs, wages, taxes, &c., to which the net earnings of the road, to the amount of $550,000, had been applied by the company.
If the decision of the court proceeded upon any idea of division of the funds, it was a division for purposes of equipment, construction, and repairs, and not for payment of interest to the mortgage creditor. Let us then see what are the points of resemblance between that case and the case before us.
*As already stated, the claims in controversy here amount to about $314,144, exclusive of interests, nine-tenths of which accrued in the year 1874 and 1875.
Between September 30, 1874, and the date of the receiver’s appointment, the gross revenues of the company were sufficient to pay all the current expenses of operating the road, including the present claims, and to leave a net income of more than $600,000. During the same period there was paid by the company to its mortgage or trust creditors, according to one estimate, the sum of $413,683; according to another estimate the sum of $317,750. Our more immediate en-quiry, however, is with the year ending September 30, 1875, as during that year the claims with which we have to deal accrued.
It appears that the gross revenues for that year were $1,033,980. How much was paid to mortgage creditors in the way of interest is not clear — according to one estimate, $101,-588; according to another, $196,000. A large amount was also paid for what is known as the Lynchburg and Danville extension. The balance of more than $400,000 was used by the company in paying its floating and unsecured debt.
It appears that a large portion of this debt was contracted in the purchase of equipments and in making repairs and useful improvements. President Barbour, in his annual report of the operations of the road for the year ending 30lh of September, 1875, states “that considerable outlays have been made during the year in the form of repairs to the roadway, bridges, and equipments, besides several small expenditures for new work and construction required for the proper working of the road.”
He further states that 1,334 tons of new iron rails and 68,753 cross-ties have been put on the track during the year. Several large bridges across the principal *rivers have been rebuilt, and extensive repairs made to the small bridges on the li.ie. The maintenance of the property in good condition has been regarded as material to the safety of the trains and the proper working of the road, apart from the policy of preserving it from depreciation.
“The necessity ot making these heavy appropriations for repairs has absorbed means to a large extent which otherwise would have been applied pro tanto in payment of the company’s indebtedness.” This explains why it was the labor and supply creditors were not paid. The money was expended in preserving the property from depreciation for the benefit of the mortgage creditors. I say, for their benefit, because the record shows that between the date of the appointment of the receiver and the 14th of October, 1879, there was paid them $603,789 from the net income of the road.
This statement of facts is, I think, sufficient to show that the present case is directly within the influence of the decisions of the supreme court of the United States.
The learned counsel for the appellees have appreciated this difficulty from the beginning, and they have not hesitated to assail those decisions as opposed to well-established principles of law, and violative of the rights of mortgage creditors.
It is admitted by them that an application for the appointment of a receiver is addressed to the sound discretion of the court, but they say it is a discretion to be exercised according to well-established rules and precedents, and when a case is made out which falls within these rules the appointment follows-as a matter of course; and they deny that a court of equity may at its will and pleasure deprive the mortgagee of his lien u-'on the net income of the road acquired by the appointment of a receiver. As the principle of law *laid down in this proposition is the turning point in the case, it is to that I propose to address myself.
No well-read lawyer at this day would venture to assert that the jurisdiction of a court of equity in any case is a mere matter of grace depending upon the favor of the court, or that the court may arbitrarily impose terms upon parties according to its caprice and pleasure as the price of its interference. When we say that the remedy is “discretionary,” we mean simply that it depends on equitable considerations exclusively. In this respect it is distinguishable from the remedy to enfore a legal right; as, for example, a suit to subject land to the lien of a judgment, or to recover damages at law for the breach of a contract.
In these latter instances the right is absolute, and the plaintiff, whether in one tribunal or the other, if he has kept himself within the strict rules of the law, is entitled to enforce his demand without qualification or condition. But when he invokes the extraordinary jurisdiction of a court of equity in his behalf, based purely upon equitable grounds, his application is not a matter of strict right, ex debito justitiae, but rests with the sound discretion of the court whether it shall be granted, looking to all the circumstances of the particular case. The court will enquire not only whether the conduct of the plaintiff has been fair and conscientious *554 in every respect, but whether the proposed relief will operate hardly and oppressively upon other parties. It will look to all the facts, and circumstances and all the collateral incidents with a view to determine its action;, and if fully satisfied the exercise of the jurisdiction in the particular case will be unjust or oppressive, it will refuse to interfere altogether, or it will impose just and reasonable terms upon the applicant as a condition of relief. In all such cases the court possesses the power of adapting its decrees to *the circumstances of the case — of adjusting cross-equities, of imposing terms, and of doing complete justice in its minutest details to all concerned. These principles apply with peculiar force to the appointment of receivers. It is an exercise of the extraordinary power of the court, based upon equitable considerations. It is often harsh and oppressive in its effects, wresting the property from the owner without a hearing and before a decree, and inflicting irreparable, mischief. As was said by Lord Eldon with reference to a bill for specific performance, the jurisdiction is not compulsory with the court, but the subject of discretion. The question is not what the court must do, but what it may do, under the circumstances. If it may refuse the application altogether, it may, as a necessary consequence, impose terms as a condition of granting it, and it may modify those terms from time to time, as occasion may require. In Owen v. Homan, 4 H. L. R. 997, Lord Cranworth said: The receiver, if appointed in this case, must be appointed on the principles on which the court of chancery acts, by preserving the property pending the litigation which is to decide the rights of the litigant parties. In such cases the court must of necessity exercise a discretion as to whether it will or will not take possession of the property by its officers. No positive unvarying rule can be laid down as to whether the court will or will not interfere by this kind of interim protection of the property. It is, howexer, useless to multiply authorities upon this subject. They may be found in the elementary works and in the adjudged cases. See High on Receivers, Kerr on Receivers, and the cases cited. The appointment of receiver is analogous in it3 nature to a preliminary injunction. Its primary object is simply to take charge of the property pendente lite so that it may be forthcoming to answer the final decree of the court. *It settles nothing; it determines no right; it is merely one of the modes in which the preventive justice of a court of chhncery is administered. It operates as an equitable sequestration of the rents and profits to be ultimately disposed of according to the rights and 'priorities of those entitled, whether regular, parties in the cause or only parties in interest coming before the court in a reasonable time to assert their claims. Beverly v. Brooke, 4 Gratt. 187.
What, then, are the rights of the parties in interest now before the court? I do not deem it necessary to go into a discussion of the principles of law relating to mortgages of railroad property. The encumbrances involved here are not mortgages; they are ordinary deeds of trust. In some of them mere power of sale is conferred upon the trustees. Under these deeds the only remedy of the trust creditors is, of course, in a sale of the property in accordance with the terms and provisions of the deeds themselves. In the other deeds it is provided, that upon default made in the payment of principal or interest and demand made by the creditors, the trustees s.hall take possession of and operate the road; and after paying the necessary expenses so incurred, they are to apply the balance to the creditors secured; or the trustees may, if required, make sale of the property. Under neither of the deeds have the creditors any lien on the earnings of the road until entry and possession taken. For, according to the authorities, although the mortgage by its terms may cover the earnings, the mortgagee has no lien upon them so long as the road remains in possession of the company, nor does a lien attach even in a suit for a foreclosure and sale until a receiver is appointed. The bill filed in this case in behalf of all the creditors, and assented to by them, avers that the trustees cannot take possession under any of the deeds in consequence *of the conflicting claims and liens upon the property, and the court is asked to take possession for the creditors, through the instrumentality of a receiver, and to sequestrate the tolls and revenues for their benefit, to the exclusion of all other creditors.
This claim of the appellees is not a matter of right on their part. It does not result from nor is it a part of their contract. To use the language of the supreme court .of New York upon this identical question, “This relief it will be readily seen from the conditions necessary to its enjoyment, does not grow directly out.of the relations of the parties or the stipulations contained in the mortgage, but out of equitable considerations alone. It is not, therefore, a matter of strict right, but it is addressed to the sound discretion of the court.” Syracuse City Bank v. Tallman, 31 Barb. 201, and cases there cited.
Upon this point the language of the supreme court of the United States is very emphatic: “The mortgagee has his strict rights, which he may enforce in the ordinary way. If he asks no favors he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of the rule which always applies in such cases, and do equity in order to get equity”’
The doctrines so laid down in Fosdick v. Schall are fully sustained.by the cases of Douglas v. Cline, 12 Bush. R. 608: Duncan v. Chesapeake and Ohio Railroad Company, 3 Court Law Journal 579; Clark v. The Williamsport and Elmira Railroad Company, decided by the supreme court of Pennsylvania. an unreported case; Poland v. The La Motte Valley Railroad Company, decided by the supreme court of Vermont; and Ellis *555 v. Boston, Hartford and Erie Railroad Company, 107 Mass. R. 1.
*There are one or two cases which hold a contrary doctrine. There may be others. Certainly the overwhelming weight of authority is in harmony with the decisions of the supreme court of the United States.
An effort has been made in the argument to distinguish this case from those decided by the supreme court in one or two important particulars. It is said, for example, if in this case the current debts for labor and supplies were not paid it was because the revenues of the company were misapplied in paying the general creditors; that both the current debt fund and the mortgage debt fund were diverted, and as this was done without the knowledge and consent of the mortgage creditors they cannot be called upon to make restitution. The same argument might have been made, and probably was made, in Hale v. Frost. There the mortgage creditors had received nothing for nearly three years. Here they received a large amount of interest. There, as here, the gross earnings of the road were sufficient to pay all the operating expenses of the road, with a large net income besides, which was applied to a floating debt of previous years; thus, diverting the funds both from the mortgage creditor and the current debt creditor. The defect in the argument of the learned c'ounsel is in supposing that the gross earnings of the company are divided into two funds — one for the payment of the mortgage debt creditor and the other for the supply and labor creditor, whereas all the earnings constitute but one fund, to no part of which the mortgage creditor is entitled until the current debt incurred in operating the road is first paid.
But let it be conceded that there are two funds of the character indicated; with what justice can it be claimed that one of them rather than the other has been misapplied? Why should we say that the current *debt fund has been diverted rather than the mortgage debt fund? A rule of that sort once established places it in the power of the company’s officers to defeat the acknowledged equity of the current debt creditor by wasting or misapplying the assets.
When the earnings of the road are diverted to pay bonded interest, to purchase equipments and to make valuable improvements, is the supply and labor creditor to be told that he is without remedy because the company has also misapplied a part of its revenues in paying its general creditor of previous years?
The reply to all such suggestions is twofold: First. The equity of the supply and labor creditor attaches to every part of the current revenue, as well that which is paid for equipments and improvements as that paid to the general creditor. Second. The mortgage creditor being directly benefitted by the equipments and improvements upon the road, cannot complain if the court uses the net income in its hands to repay what has been thus diverted from the supply and labor creditor.
According to Fosdick v. Schall, the officers of the company are in a sense the trustees of the earnings for the benefit of different classes of creditors; and if they give to one class that which properly belongs to another the court has the power to restore the parties to their original rights, and thus do what the company itself ought to do if a receiver should not be appointed.
It has been further said that to apply the equity of the current debt creditors to this case we have to trace it through the transactions of years to find out when and where the misapplication of funds was made, and upon whom the responsibility is to be fastened.
The same objection might have been urged in Hale ¶. Frost, and yet the supreme court found no difficulty in applying to that case the principles laid down in *Fosdick v. Schall. But, as a matter of fact, the difficulty is more imaginary than real. Nearly all the debts in controversy were contracted in the fiscal year terminating the 30th of September, 1875, and the diversion occurred in that year and subsequent thereto down to the time of the appointment of the receiver.
The report of the president of the company, already adverted to, and the other documentary evidence show unmistakably to what purpose and for whose benefit a large amount of the earnings were applied. This has been already explained, and need not be repeated here.
The learned counsel for the appellees, in discussing the equities of the parties litigant, tells us that the employees of the company stood by and saw without objection the revenues of the road diverted to the payment of the general creditors, and now call upon the mortgage creditors for restitution.
If it can be supposed that these employees knew anything of the condition of the company, it is difficult to see how they could prevent a diversion of the funds. They clearly could not demand the appointment of a receiver. It will not be seriously insisted that each one of them ought to have instituted his action or warrant whenever there was any delay or default in paying the wages of each accruing from time to time.
What would be the condition of a railroad company thus involved in perpetual litigation with its army of employees, with its funds under process of garnishment, and its stores and necessary supplies subject to levy and sale under interminable executions? From what source could the company obtain its labor and material absolutely essential to the successful operation of the road, when it is once understood that no man cotí,Id safely trust to its power of payment? It is a *matter of common notoriety that these employees are but too often delayed in receiving their hardly-earned wages because the revenues of the road are taken for the payment of more pressing demands or for the purchase of equipments and for necessary improvements. But for the labor *556 and supply creditor the road must stop operation, resulting in the loss of its trade and its diversion to other channels, the general deterioration of the property of the company, and lasting injury to the mortgage creditor.
If the latter, through the instrumentality of a receiver, obtains possession of a road properly appointed and equipped, yielding valuable revenues, it is due in a great measure to the class of men whose claims are the subject of controversy Iiere. The mortgage creditor knows all these things. He certainly cannot be ignorant of the continued default in the payments of the interest due him — a fact of itself sufficient to attract his attention, and excite his suspicions. And yet he leaves the company for years in the uninterrupted possession and control of the earnings of the road, afid notoriously obtaining credit from third persons for supplies and labor upon the faith of these earnings. When, under such circumstances, the creditor calls upon a court of equity to intercept the revenues for his benefit, he cannot complain that debts thus contracted shall first be paid, within limits so just and reasonable as are now prescribed by the courts.
It must not be forgotten that it is not merely the mortgage creditor and the stockholder who are interested in this species of property, but the public also are concerned. The railroads constitute the grand feature of modern civilization. Their influence is everywhere felt — in an improved agriculture. in the development and progress of manufactories, and in the gathering and diffusing the blessings of a liberal and *enlightened commerce. They have under the law public duties to perform, the neglect of which involves a forfeiture of their chartered privileges and incalculable misfortunes to the country. The personal safety and the lives of thousands of people are daily and hourly dependent upon their proper equipment and management. It is stated in one of the briefs filed in this cause that at the commencement of the past year there were more than ten thousand miles of railway in the United States being operated under the control, more or less immediate, of the courts. The assertion might safely be hazarded that nine-tenths of these companies were at the time indebted for necessary expenses incurred in operating their roads. When we consider the magnitude of the interests and the meritorious character of the claims thus involved, it is not at all surprising that the chancery courts, in the appointment of receivers for railroad companies have modified in some measure the rules applicable to ordinary mortgages of real estate. It has been said that this is a new departure. It may be so. Such departures are constantly occurring' in the changing conditions of society. More than two huñdred years ago the doctrine was established in England that the admiralty jurisdiction was limited to the ebb and flood of the tide. And that doctrine was adopted and followed in the United States until the year 1851, when .it was deliberately abandoned by the supreme court of the United States, and it was then held that the admiralty and maritime jurisdiction granted to the Federal government was not limited to tide waters, but extended. to all public navigable lakes and rivers where commerce is carried on between the different States. 12 How. 443. The whole law of insurance is not more than a century old, and more than half of its important principles and distinctions is of recent growth and *development. In the memorable language of Lord Cotting-ham, it is the duty of courts of equity to adapt its practice and course of proceeding as far as possible to the existing state of society, and to apply its jurisdiction to all those new cases wjiich, from the progress daily making in the affairs of men, must continually arise, and not from too strict an adherence to forms and rules established under very different circumstances decline to administer justice and to enforce rights for which there is no remedy. Tyler v. Salmon, 4 Myl. & Cr. R. 137, 619, 635; Mare v. Mulany, 1 Myl. & Cr. R. 559; Red. on Railroads 477.
For these reasons I think we ought to follow the decisions of the supreme court of the United States as laid down in the cases mentioned, and for the additional reason it is most important and desirable that upon such a question as this the Federal courts and the State courts within the same territorial limits shall adopt the same rules', and administer these trusts upon the same recognized principles of equity jurisprudence.
Upon the whole case my opinion is that the claims which are the subject of this controversy ought to be paid out of the net income of the road in the hands of the receiver. If this income has been used under the instructions of the circuit court for other purposes, the proceeds of the sale of the road itself may be used pro tanto to satisfy such claims. To this no well founded objection can be urged. It is a mere restoration of what has been diverted since the receivership ; and the result is precisely the same to the parties concerned. If as between the mortgage creditors themselves a portion of them have received, in the way of interest, that which they were not justly entitled to; or if expenditures have been made which ought not to have been made, it is no fault of the petitioners and the other like creditors. The existence of these was known as *early as November, 1876, and it was no doubt understood they would be asserted in this suit. The decree of the circuit court of Alexandria must be reversed, and the cause remanded for further proceedings in that court, in conformity with the views herein expressed.
The decree was as follows.:
The court having maturely considered the transcript of the record of .the decrees aforesaid and the arguments of counsel, is of opinion for reasons stated in writing and filed with the record, that the claims of the appellants for services rendered and for supplies furnished the defendant corporation previous to the appointment of the re *557 ceiver, have priority over the claim of the mortgage or trust created in the proceedings mentioned, and the said circuit court erred in not so holding by its decrees of the 25th of September, 1878, and the 13th of February, 1880. Whereupon for the error aforesaid, it is decreed that so much of the said decrees as in conflict with this decree be reversed and annulled and that the appellants recover their costs incurred in the prosecution of these appeals to be paid out of the funds under the control of the said circuit court. It is further ordered and decreed .that these causes be remanded to the said " circuit court to be there proceeded with to a final decree in conformity with this decree and the principles laid down by this court in its opinion aforesaid.
Decree reversed.