613 F.2d 1054
 14 ERC 1214, 198 U.S.App.D.C. 321, 10
Envtl. L. Rep. 20,060
 NATIONAL WILDLIFE FEDERATION
v.
Clifford ALEXANDER, Jr., in his official capacity as
Secretary, Department of the Army, et al.
NORTH DAKOTA STATE WATER COMMISSION, APPELLANT.
 No. 78-1956.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 2, 1979.
Decided Dec. 7, 1979.
As Amended Dec. 17, 1979 and Feb. 19, 1980.
 
 Murray G. Sagsveen, Asst. Atty. Gen. for the State of North Dakota, Bismarck, N.D., with whom Frederick L. Miller, Jr., Sp. Asst. Atty. Gen., Washington, D.C., was on the brief, for appellant.
 Kenneth S. Kamlet, Washington, D.C., for appellee National Wildlife Federation.
 Maryann Walsh, Atty., U.S. Dept. of Justice, Washington, D.C., with whom James W. Moorman, Asst. Atty. Gen., and Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees Clifford Alexander, Jr., Secretary of the Army, et al.
 Philip G. Sunderland, Washington, D.C., was on the brief for amicus curiae North Dakota Chapter of the Wildlife Society, urging affirmance.
 Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellees Alexander, et al.
 Before WRIGHT, Chief Judge, TAMM, Circuit Judge, and JOYCE HENS GREEN,* United States District Judge for the District of Columbia.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 This action involves the planned construction of a drainage channel that would empty into Devils Lake, a natural lake wholly within North Dakota. On cross-motions for summary judgment, the trial judge found that Devils Lake is a navigable water of the United States within the meaning of section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 (1976).[1] He ordered that work cease on the project until the construction is recommended by the Chief of the U.S. Army Corps of Engineers and authorized by the Secretary of the Army pursuant to section 10. The district court further ordered the Secretary to revise the Corps' regulations under section 10 to cover all activities within the ambit of that section. We reverse the court's finding that Devils Lake is a navigable water of the United States, for we conclude that this term requires a body of water to have an interstate connection by water, which Devils Lake lacks. We also vacate the parts of the order that enjoin work on the channel and remand the case to the district court.
 
 I. BACKGROUND
 
 2
 The facts in this case are not in dispute. Devils Lake is located entirely within the State of North Dakota. Its surface covers approximately 34,000 acres. No stream, river, or other waterway flowing into or out of the lake crosses North Dakota's border with another state or with Canada or connects with any other body of water so as to form a continuous interstate or international water course. Devils Lake is navigable in fact, although its current uses are recreational; for example, fishing, boating, water skiing, and hunting. Many of those using the lake for these recreational purposes come from outside North Dakota. In 1973 the Corps determined that Devils Lake is a navigable water of the United States.[2]
 
 
 3
 The North Dakota State Water Commission (Water Commission) has committed substantial funds to the Channel "A" project, which involves the construction by two county water management districts of a 3.9-mile ditch designed to drain excess surface water into Devils Lake. Flood waters passing through Channel "A" will flow into Devils Lake through a preexisting natural coulee. Thus, the channel itself will not encroach into the waters of the lake, although it likely will raise the water level slightly.[3]
 
 
 4
 Section 10 of the Rivers and Harbors Act of 1899 (1899 Act) provides, in relevant part, that
 
 
 5
 it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any . . . lake . . . or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 
 
 6
 33 U.S.C. § 403 (1976). The water management districts commenced work on Channel "A" without any authorization from the Department of the Army. At the time, the Corps of Engineers declined to exercise jurisdiction over the project because its regulations provided that the permit requirement in section 10 would apply to work occurring outside the water itself only if it would "affect the course, location, or condition of the waterbody in such a manner as to impact on the navigable capacity of the waterbody." 33 C.F.R. § 322.3(a)(1) (1978).
 
 
 7
 On September 27, 1977, the National Wildlife Federation (NWF) filed this action against the Secretary of the Army and the Chief of the Corps of Engineers (the federal defendants) in the United States District Court for the District of Columbia. In its complaint, NWF alleged that a drainage ditch like the proposed Channel "A" can affect the capacity and the navigability of a waterway such as Devils Lake by introducing large volumes of water at a rapid rate and that it also can change the waterway's condition by introducing silt, sediment, and chemicals in large amounts.[4] NWF asked the court to declare the federal defendants in violation of section 10 for failing to promulgate regulations that govern activities out of the water affecting the water's condition or capacity in ways other than impairing its navigability,[5] to order promulgation of regulations in this area, to enjoin the federal defendants from disavowing jurisdiction over manmade channels and ditches within the scope of section 10, and to grant such other relief as the court might deem appropriate.
 
 
 8
 The court granted the Water Commission leave to intervene in the case as a party defendant. The Water Commission also filed a cross-claim against the federal defendants asserting that Devils Lake and other waters in the Devils Lake Basin are not navigable waters of the United States and thus are not subject to the 1899 Act. It asked the court to declare the federal defendants in violation of the 1899 Act for asserting jurisdiction over the waters in Devils Lake Basin, to enjoin them from asserting jurisdiction, and to order them to alter their regulations accordingly.
 
 
 9
 The parties filed cross-motions for summary judgment on October 21, 1977. The trial judge heard argument on August 17, 1978. The following day he entered an order granting NWF's motion for summary judgment and denying that of the federal defendants. The order also enjoined work on Channel "A" until recommended by the Chief of the Corps and authorized by the Secretary, and it further commanded modification of the regulations so that the Corps would provide a permit procedure for projects such as Channel "A" and other activities within the ambit of section 10. From this ruling the Water Commission appeals.[6]
 
 
 10
 The principal question before us is whether Congress, by employing the words "navigable waters of the United States" in section 10, intended the provisions of that section to govern, on the one hand, all waterways within the United States that can sustain interstate commerce or, on the other hand, only those waterways that connect with others so as to form an uninterrupted water highway crossing state lines. The parties agree, as do we, that Congress has the power to reach all waters that may be used in, or the use of which can affect, interstate commerce. The issue thus is whether the 1899 Act reaches all these waters or only those that by themselves or by joining with others cross state borders.[7]
 
 
 11
 II. FEDERAL REGULATION OF INTERNAL NAVIGATION BEFORE 1890
 
 A. Early Cases
 
 12
 To analyze correctly the scope of section 10, we first must look to the history of federal regulation of waterborne commerce. From the earliest days of the Republic, the Supreme Court has traced federal authority over navigation to two separate sources: Congress's power to regulate commerce, U.S. Const. art. I, § 8, and the federal courts' jurisdiction over admiralty and maritime cases, Id. art. III, § 2. The seminal decisions in this area evince a blending of these two strands of authority. By the mid-nineteenth century, the Court had concluded that the power to regulate commerce encompassed regulation of navigation and that improved means of waterborne commerce required an articulation of federal admiralty jurisdiction different from and broader than the one historically applied in England.
 
 
 13
 In the landmark case of Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), the Supreme Court first held that the congressional power over interstate and foreign commerce includes regulation of navigation. In his historic opinion, Chief Justice Marshall wrote:
 
 
 14
 All America understands, and has uniformly understood, the word "commerce," to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it. The (constitutional) convention must have used the word in that sense, because all have understood it in that sense; and the attempt to restrict it comes too late.
 
 
 15
 Id. at 190. Gibbons v. Ogden Concerned a state's attempt to exclude certain vessels from its waters despite their licensure by the federal government. The decision rested on the commerce power and the supremacy of federal laws over those of the states, See U.S. Const. art. VI.
 
 
 16
 The year after Gibbons v. Ogden, the Court gave a much narrower reading to the admiralty clause. In The Steamboat Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825), it held that jurisdiction over libels arising under maritime contracts would lie only if "the service was substantially performed, or to be performed, upon the sea, or upon the waters within the ebb and flow of the tide." Id. at 429. This result comported with the English common-law view of admiralty, which limited that jurisdiction to the oceans and tidal waters. Before the Court in The Thomas Jefferson was a libel, not an action arising under a federal statute regulating navigation. The Justices expressly reserved the question of whether Congress, under the commerce power, could extend admiralty-type remedies to occurrences on nontidal, inland waters. See id. at 430.
 
 
 17
 Despite the holding in The Thomas Jefferson, Congress in 1845 expanded the admiralty jurisdiction of the district courts to include certain types of cases arising on inland lakes and the waters connecting them. See Act of Feb. 26, 1845, ch. 20, 5 Stat. 726. The question of whether the admiralty clause permitted Congress to enlarge federal jurisdiction to occurrences on these nontidal waters came before the Supreme Court in the 1851 case of The Propeller Genessee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851). The Court noted that the common-law rule limiting admiralty law to tidal waters made sense in England, an island in which all streams navigable in fact were also subject to the tides. The tidal standard prevailing in English courts thus was the equivalent of one using navigability as the test. Id. at 454-55. Moreover, before the advent of the steamboat, foreign commerce in America simply did not pass beyond the influence of the tides. The Court reasoned that The Thomas Jefferson was a product of the mentality of a day gone by and had to be reconsidered. It concluded:
 
 
 18
 It is evident that a definition that would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible. We have thousands of miles of public navigable water, including lakes and rivers in which there is no tide. And certainly there can be no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public water used for commercial purposes and foreign trade. The lakes and the waters connecting them are undoubtedly public waters; and we think are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States.
 
 Id. at 457 (emphasis added).[8]
 B. The Daniel Ball and The Montello
 
 19
 Despite the wider federal power over navigation, a definition of navigable waters of the United States did not emerge before the latter part of the nineteenth century. In 1838 Congress enacted a statute requiring a federal license for any vessel carrying passengers or cargo on the "navigable waters of the United States." Act of July 7, 1838, ch. 191, § 2, 5 Stat. 304. Later legislation compelled a limited safety inspection for such a ship. Act of Aug. 30, 1852, ch. 106, 10 Stat. 61. It was not until 1870 that a case required the Supreme Court to define navigable waters of the United States. In The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), and The Montello, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1870), the Court interpreted the term as limiting the application of the statutes to vessels on waterways forming part of a continuous interstate water highway. The Water Commission relies heavily on these decisions to support its position that section 10 of the Rivers and Harbors Act of 1899 does not apply to Devils Lake.
 
 
 20
 Although the action in The Daniel Ball arose in admiralty the two statutes mandated this procedural form the Court discussed congressional regulation of waterborne traffic wholly in terms of the commerce power. The United States filed a libel against a steamer that had carried passengers and cargo on the Grand River in Michigan without meeting the requirements of federal inspection and licensure. The owners of the ship defended on the ground that the Grand River, being entirely within the borders of Michigan, was not a navigable water of the United States within the meaning of the statutes. The owners conceded, however, that some of the goods aboard had come from or were bound for states other than Michigan.
 
 
 21
 The Court had no problem in finding that the steamer was engaging in interstate commerce. Because it carried cargo that had originated in or was destined for points in other states, it was an instrument of commerce among the states, even though the ship itself never crossed a state boundary. See id. at 565. The commerce power
 
 
 22
 authorizes all appropriate legislation for the protection or advancement of either interstate or foreign commerce, and for that purpose such legislation as will insure the convenient and safe navigation of all the navigable waters of the United States, whether that legislation consists in requiring the removal of obstructions to their use, in prescribing the form and size of the vessels employed upon them, or in subjecting the vessels to inspection and license, in order to insure their proper construction and equipment.
 
 
 23
 Id. At 564.
 
 
 24
 Having decided that Congress had the power to pass the statutes, the Court still had to determine whether the Grand River was a navigable water of the United States, for if the river were not the ship would have fallen outside the language of those statutes. The Court first noted that the old tidewater test no longer applied. See id. at 563 (citing, e. g., The Propeller Genessee Chief v. Fitzhugh, discussed at p. ---- of 198 U.S.App.D.C., p. 1058 of 613 F.2d Supra). It then explained what Congress meant when it employed the phrase "navigable waters of the United States." First, the waterways must be navigable in fact; that is, they must be capable of being used for commerce. Second, they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.
 
 
 25
 Id. at 563 (emphasis added). Applying this standard to the facts before it, the Court found that because the Grand River emptied into Lake Michigan it "is thus brought under the direct control of Congress in the exercise of its commercial power." Id. at 564.
 
 
 26
 Shortly after deciding The Daniel Ball, the Court faced a similar case in The Montello, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1870). The owners of this ship had failed to obtain a federal license and had violated the safety provisions of the 1852 law. They responded to a libel commenced by the United States by arguing that the steamer had been operating on the Fox River in Wisconsin, which, they asserted, was not a navigable water of the United States.
 
 
 27
 The Court remanded the case for a determination of whether the Fox River connected with other waters to form a continuous water highway that eventually crossed into another state. Should such a connection exist, the Court decided, the river would fall within the language of the two acts. On the other hand, absent such a connection the river
 
 
 28
 is not a navigable water of the United States, but only a navigable water of the State, and the acts of Congress, to which reference is made in the libel, for the enrolment and license of vessels, have no application. Those acts only require such enrolment and license for vessels employed upon the navigable waters of the United States.
 
 
 29
 Id. at 415. Thus, the Court in The Montello not only reiterated The Daniel Ball'S requirement that there be an interstate connection by water but also refused to decide the case until that connection was proved.[9]
 
 
 30
 Furthermore, the Court expressly considered whether an out-of-state origin or terminus for the goods carried would subject the ship to the statutes. The Court concluded that the interstate character of the transportation "does not affect the question under consideration, for Congress has not prescribed any regulations governing such commerce, except so far as it is conducted in vessels on the navigable waters of the United States." Id. In other words, the Supreme Court stated that commerce on waters lacking an interstate connection by water could be interstate commerce but that any statute using the words "navigable waters of the United States" would be construed as applying only to waters with such a connection. Thus, while confirming congressional power over all waterways usable in interstate commerce, the Court in The Montello held that Congress had stopped short of exercising its full authority by virtue of its having restricted the statutes' coverage to navigable waters of the United States.
 
 III. THE RIVERS AND HARBORS ACTS
 A. The 1890 Act
 
 31
 Congress enacted portions of the Rivers and Harbors Acts of 1890 and 1899 as a response to a series of cases in the mid-1800's, beginning with Willson v. Black-Bird Creek Marsh Co., 27 U.S. (2 Pet.) 245, 7 L.Ed. 412 (1829), and culminating with Williamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 810, 31 L.Ed. 629 (1888). In these cases the Supreme Court repeatedly had held that state legislatures could authorize the construction of bridges and other structures potentially obstructing local waters usable in interstate commerce, at least until Congress acted to prevent these actions.[10] In Williamette Bridge, for example, the Court had noted:
 
 
 32
 The power of Congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned. But until it does pass some such law, there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers . . . . There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the States.
 
 
 33
 Id. at 8, 8 S.Ct. at 815.
 
 
 34
 Responding to this line of cases, Congress appended to the 1890 appropriations bill for rivers and harbors several sections regarding the maintenance of navigable bodies of water. See United States v. Republic Steel Corp., 362 U.S. 482, 485-86, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). The law as enacted forbade "the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction . . . ." Rivers and Harbors Act of 1890 (1890 Act), ch. 907, § 10, 26 Stat. 426 (current version at 33 U.S.C. § 403 (1976)). The statute also required permission from the Secretary of War before one could build any wharf, pier, or dam, begin construction of a bridge, or "excavate or fill, or in any manner . . . alter or modify the course, location, condition, or capacity of the channel of (any) navigable water of the United States . . . ." Id. S 7 (current version at 33 U.S.C. §§ 401, 403 (1976)).
 
 
 35
 Unfortunately, the legislative history of these sections is scant, particularly concerning what Congress meant when it employed the words "navigable waters of the United States." We have found, however, that at one point during the House's debate of the Act, a representative referred expressly to The Daniel Ball and quoted its construction of navigable waters of the United States.[11] In addition, the earliest reported interpretation of the 1890 Act by the Attorney General used the language of The Daniel Ball in deciding whether particular rivers were navigable waters of the United States and thus subject to the Act's provisions. See 20 Op. Att'y Gen. 101, 105 (1891).[12]
 
 B. The 1899 Act
 
 36
 In 1896 Congress directed the Secretary of War to prepare a single compilation of all general laws then in force concerning navigable waters of the United States, together with his recommendations for revising and improving these statutes. Rivers and Harbors Act of 1896, ch. 314, § 2, 29 Stat. 202. On February 10, 1897, the Chief of Engineers submitted his compilation to the Secretary of War, who forwarded it to the Speaker of the House of Representatives on February 13. See Laws for Protection of Navigable Waters, H.R.Doc.No.293, 54th Cong., 2d Sess. 1 (1897). In 1899 Senator Frye, Chairman of the Senate Committee on Rivers and Harbors, introduced much of this draft as an amendment to the annual rivers and harbors appropriations bill then pending. He represented that the proposed provisions would combine scattered sections already in force but not change existing law. 32 Cong.Rec. 2296-97 (1899) (remarks of Sen. Frye). Accord, id. at 2922 (report of House Conferees). After cursory discussion, Congress enacted the Corps' proposals. See 1899 Act, ch. 425, §§ 9-17, 19-20, 30 Stat. 1121 (current versions at 33 U.S.C. §§ 401, 403-404, 406-409, 411-415 (1976)). The excavation and fill provisions originally appearing in section 7 of the 1890 Act were placed in section 10 of the new statute, where they remain today.
 
 IV. THE STATUS OF DEVILS LAKE
 
 37
 Our discussion of the history of section 10 has revealed several factors relevant to the application of the phrase "navigable waters of the United States" to Devils Lake. First, on at least two occasions the Supreme Court held explicitly under other statutes that these words required an interstate connection by water. Second, this construction of the phrase was brought to the attention of the House during debates over the 1890 Act. Third, in a contemporaneous application of this statute, the Attorney General quoted the language of the earlier Supreme Court opinions and adopted it as the test under the 1890 Act. Finally, Congress, in adopting the 1899 Act, simply translated existing law almost verbatim into the section in force today and by this action intended no substantive changes.
 
 
 38
 The Water Commission argues that these factors indicate the phrase "navigable waters of the United States" had a well-settled meaning when Congress passed the 1890 and the 1899 Acts and thus Congress must have intended to adopt this construction in the new laws. NWF and the federal defendants counter with several other considerations that they claim justify a broader interpretation of these words. We find the latter arguments unpersuasive and conclude that Congress in 1890 and 1899 meant to limit section 10 to those waters usable in interstate commerce that connect with other waters so as to form a continuous interstate waterway.[13] Therefore, Devils Lake is not a navigable water of the United States and is outside the scope of section 10.
 
 A. Well-Settled Judicial Meaning
 
 39
 When words used in a statute had a well-settled judicial meaning at the time the statute was enacted, courts presume that the legislature intended to continue the existing interpretation in the new statute absent contextual or historical evidence to the contrary. E. g., Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939); The Abbotsford, 98 U.S. 440, 444, 25 L.Ed. 198 (1878). NWF and the federal defendants contend that this rule of statutory construction should not apply in this instance for two reasons.
 
 
 40
 First, NWF and the federal defendants assert that the statutes at issue in The Daniel Ball and The Montello were not related to section 10 closely enough for us to infer that Congress, in using the same language, was carrying over these cases' construction. We disagree. Both laws are regulations of navigation under the commerce power. Although the causes of action in The Daniel Ball and The Montello were penal in nature and assumed the form of libels in admiralty, the Court explained the statutes and supported their validity on interstate commerce grounds. Use of the phrase pervades the matrix of navigation laws that Congress enacted in the 1800's.[14] Although licensing ships and forbidding interference with navigation are not identical goals, both serve the ends of promoting commerce by water. The function of the language "navigable waters of the United States" in both instances is to define the extent of federal regulation by stating that commerce on only certain bodies of water would be subject to the provisions of the respective statutes.[15]
 
 
 41
 Second, NWF and the federal defendants claim several post-1899 cases demonstrate that a more expansive construction of navigable waters of the United States now prevails. Some of these cases, however, deal not with the construction of the 1899 Act but with the extent of the commerce power.[16] We must keep in mind that The Daniel Ball and The Montello held only that the acts passed by Congress did not reach intrastate waterways lacking an interstate connection by water. They did not confine congressional power to reach these bodies of water. Indeed, The Montello suggested that Congress could go further if it desired. See pp. ---- - ---- of 198 U.S.App.D.C., pp. 1059-1060 of 613 F.2d Supra. All the other cases dealt only with whether particular rivers were navigable in fact, a matter stipulated here. They did not discuss the issue of interstate connection.[17] NWF and the federal defendants have pointed to no case that has expanded the term by dropping the requirement of an interstate connection by water in the absence of an expressly broader statutory definition.[18]
 
 
 42
 B. Implied Congressional Adoption of the New Regulations' Definition
 
 
 43
 NWF and the federal defendants also point to congressional action (and inaction) in 1976 on the definition of navigable waters of the United States. They claim that by addressing the question of the term's scope and not correcting new regulations promulgated by the Corps, Congress acquiesced in a construction that abandons the interstate connection requirement.
 
 
 44
 For many years the Corps' regulations did not define navigable waters of the United States. Instead, they simply quoted the language of The Daniel Ball and stated that authoritative interpretation lay with the courts. 11 Fed.Reg. 177 A-805, -824 (1946) (revoked 1972). In 1972, however, the Corps promulgated a new rule that more precisely defined the term:
 
 
 45
 Navigable waters of the United States are those waters which are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the water body, and is not extinguished by later actions or events which impede or destroy navigable capacity.
 
 
 46
 37 Fed.Reg. 18,289, 18,290 (1972) (current version at 33 C.F.R. § 329.4 (1978)). Historical use, even in frontier days, would be evidence of navigability, as would present recreational use. Id. (revoked 1978).[19] On the question of the water's interstate nature, the new regulations provided that although a physical connection "with a generally acknowledged avenue of interstate commerce, such as the ocean or one of the Great Lakes" would make its interstate character clear, it would not be "necessary that there be a physically navigable connection across a state boundary." Id. (current version at 33 C.F.R. § 329.7 (1978)).[20]
 
 
 47
 Congress reacted to these broader regulations in 1976 by contracting the Corps' jurisdiction somewhat. First, it exempted three specific intrastate lakes from all the provisions of section 10. Water Resources Development Act of 1976, Pub.L.No.94-587, § 162, 90 Stat. 29 (codified at 33 U.S.C. § 59m (1976)). The Senate committee that proposed the exemptions, however, expressed its belief that these lakes and other bodies of water never had been meant to be subject to section 10. The committee stated that it had evaluated the problem only with respect to these particular lakes and indicated its intent to hold hearings on the more general problem of such waters the following year. See S.Rep.No.94-1255, 94th Cong., 2d Sess. 124-25 (1976). Second, Congress exempted from the wharf and pier provisions of section 10 any body of water located entirely within one state if its classification as a navigable water of the United States rested solely on its historical use. Water Resources Development Act of 1976, § 154 (codified at 33 U.S.C. § 59L (1976)).[21]
 
 
 48
 NWF and the federal defendants argue that Congress, in addressing these particular aspects of the Corps' expanded regulations but not affirmatively reinstating the requirement of an interstate connection by water, tacitly has adopted the new construction. We cannot agree. The Senate report on the section exempting the three specific lakes indicated a continuing dissatisfaction with the Corps' new assertion of jurisdiction. S.Rep.No.94-1255, Supra at 124. In addition, one member of the House, decrying this expansion, included in his grievances not only classification based wholly on historical use but also the abandonment of the requirement of an interstate connection by water:
 
 
 49
 Unlike the 1972 Water Pollution Control Act, the Rivers and Harbors Act does not go on to define the meaning of navigable waters. As a result, the courts have been given primary responsibility for interpreting the meaning of the term. At the time of passage of the act, the essence of the definition was that the regulated waterway forms a continuous water link between States or countries over which commerce "is or may be carried on * * * in the customary modes," The Daniel Ball (10 Wall. 557, 563 (19 L.Ed. 999)). . . .
 
 
 50
 . . . (Under the new regulations,) the requirement that the body of water form a continuous waterway between States was transformed into the simple requirement that the waterway in conjunction with other forms of transportation form a continuous transportation link between States. Thus, a body of water, completely landlocked within the borders of a single State might be found to possess an interstate character if a Federal highway or railroad line ran adjacent to it. Under this farfetched definition, it is difficult to conceive of many bodies of water which would not qualify for Federal supervision.
 
 
 51
 122 Cong.Rec. 33,588-89 (1976) (remarks of Rep. Hagendorn). He then praised section 154 of the Water Resources Development Act of 1976 for eliminating the historical-use test but noted that other problems remained with the expanded Corps jurisdiction. Id. at 33,589.
 
 
 52
 Although one can conclude, as NWF and the federal defendants would have us do, that congressional inaction implies approval, "(l)ogically several equally tenable inferences could be drawn from the failure of the Congress to adopt an amendment . . . including the inference that the existing legislation already incorporated the offered (amendment)." United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962), Quoted in Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 138 n.44, 479 F.2d 842, 859 n.44 (D.C.Cir.) (en banc) (Wright, J.), Cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).[22] Indeed, one just as easily could point to the 1974 case of Hardy Salt Co. v. Southern Transportation Co., 501 F.2d 1156 (10th Cir.), Cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), and conclude that Congress instead was acquiescing to the ruling of the Court of Appeals for the Tenth Circuit that navigable waters of the United States requires an interstate connection by water. In sum, we do not believe that Congress's failure to correct all the problems it has found with the Corps' new regulations suggests ratification of the provisions it has not yet addressed. Rather, we believe its voiced dissatisfaction with them indicates disagreement.
 
 C. Remedial Nature of Section 10
 
 53
 NWF and the federal defendants also argue that section 10 is a remedial statute that courts should construe broadly to effect the general congressional intent behind it. See, e. g., Wyandotte Transportation Co. v. United States, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Republic Steel Corp., 362 U.S. 482, 491, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). We do not believe, however, that reading the statute broadly can avoid the history of the phrase "navigable waters of the United States," a history that gives that term a specific meaning.
 
 
 54
 NWF and the federal defendants support their contention by pointing to a 1926 lecture by G. W. Koonce, at the time a veteran of almost forty years with the Corps and one of the authors of the 1897 compilation of statutes that Congress adopted in 1899. See Lecture by G. W. Koonce, Fort Humphreys, Va. (Apr. 23, 1926), Reprinted in Water Pollution Control Legislation 1971 (Oversight of Existing Program): Hearings Before the House Comm. on Public Works, 92d Cong., 1st Sess. 284 (1971). Koonce stated that the 1899 Act
 
 
 55
 was intended to be, and is, an assertion of police power to protect from physical injury those highways of commerce in which the Federal Government has dominion and propriety, and within its comprehensive provisions are embraced all forms and varieties of physical obstructions. An examination and study of the law will impress anyone with the organic and far reaching character of the jurisdiction asserted, and with its evident value both as a preventative and remedial measure.
 
 
 56
 Id. at 288.
 
 
 57
 NWF and the federal defendants have failed to mention that Koonce's very next words were:
 
 
 58
 In approaching a discussion of some of the provisions of the law of 1899, applicable only to the navigable waters of the United States, it may be pertinent to inquire what are the navigable waters of the United States, to which they apply. . . . As defined by the courts:
 
 
 59
 A river is navigable in law when it is navigable in fact . . . . A river navigable in fact . . . is a navigable water of the United States, within the meaning of the acts of Congress, when it forms by itself, or by uniting with other waters, a continuous highway over which commerce is or may be carried on with the several States or with foreign countries.
 
 
 60
 Id. (emphasis added). Thus, despite his expansive reading of what the 1899 Act does, Koonce still construed navigable waters of the United States according to The Daniel Ball and The Montello. Although the provisions of the statute should be read broadly once they apply to a particular waterway, finding that waterway to be subject to the 1899 Act in the first place still requires an interstate connection by water. Continuing to apply this definition seems to conform more closely to what Congress intended.
 
 V. CONCLUSION
 
 61
 When Congress used the phrase "navigable waters of the United States" in the 1890 Act and later in the 1899 Act, it employed words that through judicial construction had assumed a particular, refined meaning. This choice, regardless of the reasons that lay behind it, is one to which the courts must give effect. With an interstate connection by water being a prerequisite for regulation under section 10 of the 1899 Act and with Devils Lake lacking such a connection, we must conclude that Devils Lake is not a navigable water of the United States within the meaning of the statute.
 
 
 62
 Because Devils Lake is not a navigable water of the United States, section 10 does not require the county water management districts to obtain a permit from the Corps before proceeding with the Channel "A" project. Therefore, we must vacate that part of the district court's order requiring work on the Channel "A" project to stop pending approval by the federal defendants. This conclusion also means that we do not reach the second issue raised by the Water Commission in its appeal; namely, whether the project would affect the condition or capacity of Devils Lake within the meaning of section 10.[23]
 
 
 63
 In reaching our decision, we recognize the difficulty of discerning the intent of a Congress that sat ninety years ago and of construing the ambiguous posture of more recent Congresses in relation to section 10. Although we have rejected the views of NWF and the federal defendants on these issues, we take recent congressional activity in this field as a sign that if Congress disagrees with our reading of "navigable waters of the United States," or if it now wishes to broaden the Corps' jurisdiction under the commerce power, it can and will make its position clear.
 
 
 64
 For the foregoing reasons, we reverse the finding of the district court that Devils Lake is a navigable water of the United States, vacate that part of the order enjoining work on the Channel "A" project, and remand the case for further proceedings not inconsistent with this opinion.
 
 
 65
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 For the text of this section, see p. ---- of 198 U.S.App.D.C., p. 1056 of 613 F.2d Infra
 
 
 [2]
 The Corps based its 1973 determination on evidence of actual use for commercial navigation in the 1800's. See Joint Appendix at 96 (Determination of Navigability). Current law, however, prevents the classification of a body of water as a navigable water of the United States for the purpose of obtaining wharf and pier permits solely on the basis of its historical use for commerce. See 33 U.S.C. § 59L (1976), Discussed at p. --- of 198 U.S.App.D.C., p. 1064 of 613 F.2d Infra. This case involves other provisions of § 10, and the parties here nevertheless agree that Devils Lake still is navigable in fact. See text. The question that remains is whether it is a navigable water of the United States within the meaning of § 10
 
 
 [3]
 The Water Commission contends that a factual issue remains over the effect of Channel "A" on Devils Lake. It argues that even if no interstate connection is required and Devils Lake is a navigable water of the United States, Corps regulations may not apply to Channel "A": it will not affect the navigability of the lake. Because we conclude that the lake is not subject to Corps regulation under § 10, See p. --- of 198 U.S.App.D.C., p. 1066 of 613 F.2d Infra, we need not decide the exact effect of Channel "A" on Devils Lake or whether this effect would be sufficient to require a permit if § 10 applied
 
 
 [4]
 NWF also predicted damage to fish and wildlife in both the lake and the surrounding wetlands
 
 
 [5]
 NWF also sought to have the court find the federal defendants in violation of the National Environmental Policy Act of 1969, § 102(1), 42 U.S.C. § 4332(1) (1976)
 
 
 [6]
 The federal defendants do not appeal. They join NWF in support of the district court's order insofar as it finds Devils Lake to be a navigable water of the United States
 
 
 [7]
 The Water Commission raised as an alternative ground for reversal the asserted absence of any effect on the navigability of Devils Lake. We find it unnecessary to reach this question, however, because of our decision on the scope of § 10. See note 3 Supra
 
 
 [8]
 The Court expressly found that Congress had based the 1845 statute solely on the admiralty clause and not on its commerce power. See 53 U.S. (12 How.) at 451-53. The final decision to uphold the provision thus rested entirely on the breadth of the admiralty clause. A modern Court might receive more favorably an argument that Congress may exercise an enumerated power under U.S.Const. art. I, § 8 by giving federal courts jurisdiction to hear certain kinds of cases. See National Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 588-604, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (opinion of Jackson, J.)
 
 
 [9]
 On remand, the circuit court found that the river in its natural state was not navigable due to numerous rapids. The Supreme Court, however, concluded that because improvements and portages permitted it to be used in commerce and because the river emptied into Green Bay, it was a navigable water of the United States. The Montello, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874)
 
 
 [10]
 For other cases, see those cited in Williamette Iron Bridge Co. v. Hatch, 125 U.S. at 8-9, 8 S.Ct. 810
 
 
 [11]
 The issue being debated was not precisely the one before this court today; namely, the construction of the phrase "navigable waters of the United States" in the section on excavations and fills. Instead, one representative had remarked that the federal government could regulate the Kentucky River, which flowed through his district, because the Kentucky legislature had ceded control of it back to the United States. The proponent of the bill had a different theory and stated in response:
 The river itself has never ceased to be a navigable water way of the United States, is now and always has been such; and what is a navigable water way of the United States has been precisely defined by the Supreme Court in the case of (The) Daniel (Ball), 10 Wallace 557 (19 L.Ed. 999):
 "Those rivers," say the court, "constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form, in their ordinary condition, by themselves or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."
 Now that applies to the Kentucky River, which, by its connections, has an outlet to the Gulf of Mexico, and is therefore, under the terms of this decision in 10 Wallace, a navigable water way of the United States.
 
 
 [21]
 Cong.Rec. 5400 (1890) (remarks of Rep. Blanchard). Thus, on the floor of the House during debate over the statute that originally enacted the provision before us in this case, a congressman quoted the language of The Daniel Ball as the definition of navigable waters of the United States and proved his argument that a certain body of water fell within the meaning of this term by citing its interstate connection by water
 
 
 [12]
 The opinion concerned whether the Chicago River was a navigable water of the United States. The Attorney General first noted that the stream was wholly within Illinois but that it connected with Lake Michigan. 20 Op. Att'y Gen. at 103. After reviewing admiralty cases, he recapitulated the test in The Daniel Ball and The Montello. Id. at 105. He finally concluded that "the Chicago River is as much a part of the navigable waters of the United States as is the Strait of Mackinac." Id. at 106
 
 
 [13]
 In so concluding, we find ourselves in agreement with the two other circuits that have addressed this question. See Minnehaha Creek Watershed Dist. v. Hoffman, 597 F.2d 617 (8th Cir. 1979); Hardy Salt Co. v. Southern Transp. Co., 501 F.2d 1156 (10th Cir.), Cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974)
 We also find support for this conclusion in the Supreme Court's very recent decision in Kaiser Aetna v. United States, --- U.S. ----, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In this case, the Court held that the federal government could not require the owners of a pond, concededly a navigable water of the United States under § 10 because of its connection with the Pacific Ocean, to open it for public use without receiving just compensation. Justices Blackmun, Brennan, and Marshall dissented from this result. In passing, they noted that in determining whether simply being a navigable water of the United States carries with it a requirement of public access, "we quickly may cast aside any distinction based on the qualifying phrase 'of the United States.' As prior cases demonstrate, this phrase is intended to draw the line between waters that may be navigated only intrastate, and those that are subject to navigation in interstate and foreign commerce." Id. at ---- n.4, 100 S.Ct. at 388 n.4 (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting) (citing, Inter alia, The Daniel Ball ).
 
 
 [14]
 In addition to the statutes actually construed in The Daniel Ball and The Montello, see p. --- of 198 U.S.App.D.C., p. 1058 of 613 F.2d Supra, Congress used the phrase in several other laws passed during the 19th century. For example, this language appears in an 1879 law exempting certain vessels from the fee provisions of the licensing statutes. Act of June 30, 1879, ch. 54, 21 Stat. 44 (current version at 46 U.S.C. § 332 (1976)). In 1880, Congress authorized the Secretary of War to remove wrecks blocking navigable waters of the United States. Act of June 14, 1880, ch. 211, § 4, 21 Stat. 197 (current version at 1899 Act § 19, 33 U.S.C. § 414 (1976)). In 1888, Congress provided a compensatory action for persons injured when bridges deflected navigable waters of the United States so as to cave in banks or to injure lands in some other manner. Act of Aug. 11, 1888, ch. 860, § 2, 25 Stat. 400
 
 
 [15]
 We also note that Congress used the phrase "any waters, in respect of which the United States has jurisdiction" in § 10 of the 1890 Act. See p. --- of 198 U.S.App.D.C., p. 1060 of 613 F.2d Supra. Thus, Congress was capable of employing other, seemingly broader language in defining the scope of federal regulation
 
 
 [16]
 See, e. g., Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 579 (1912)
 
 
 [17]
 See Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); United States v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931); Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900). In all these cases, the bodies of water had obvious interstate links by water or the controlling legal standard did not require such a connection. Thus, the Court's decision turned solely on whether they were navigable in fact
 
 
 [18]
 NWF and the federal defendants rely to some degree on The Katie, 40 F. 480 (S.D.Ga.1889), Writ of prohibition denied sub nom. In re Garnett, 141 U.S. 1, 11 S.Ct. 840, 35 L.Ed. 631 (1890). That case, however, arose under a statute applying to "all sea-going vessels, and also to all vessels used on lakes or rivers or in inland navigation . . . ." Act of June 19, 1886, ch. 421, § 4, 24 Stat. 79. The court upheld this language against a constitutional challenge by finding that the commerce power reached all vessels carrying goods that originated in or were destined for other states. The opinion at no time construed a statute using the words "navigable waters of the United States." Thus, The Katie stands only for the proposition that Congress Has power to regulate wholly intrastate lakes that have no interstate connections, a point that the Water Commission concedes. This holding still does not answer the question of whether Congress Has exercised that power
 
 
 [19]
 In 1976, Congress enacted a provision forbidding the Corps to apply the historical-use standard. See p. --- of 198 U.S.App.D.C., p. 1064 of 613 F.2d Infra
 
 
 [20]
 For a discussion of these changes and their application in certain other areas of Corps regulation, see Power, The Fox in the Chicken Coop: The Regulatory Program of the U. S. Army Corps of Engineers, 63 Va.L.Rev. 503, 513-21 (1977)
 
 
 [21]
 Waterways presently navigable in fact or capable of navigation in the future still are subject to § 10. H.R.Rep.No.94-1702, 94th Cong., 2d Sess. 113 (1976)
 
 
 [22]
 In Wilderness Society this court used Congress's having voted down an amendment as evidence of its intent. 156 U.S.App.D.C. at 138, 479 F.2d at 859. The court stated that it could infer intent from such an affirmative stand but expressed hesitancy over drawing similar conclusions from Congress's taking no action whatsoever. Id. at 138 n.44, 479 F.2d at 859 n.44 (citing National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (D.C.Cir.1971)). In the case before us now, we have no instance of express congressional rejection of amendments to narrow the definition of navigable waters of the United States, only proposals on which no action was taken, one way or the other
 
 
 [23]
 Because the federal defendants have not appealed, deciding whether § 10 governs activities outside the water that affect the water's conditions in ways other than navigability in effect would be rendering an advisory opinion